G. Eric Brunstad, Jr. (admitted *pro hac vice*)
eric.brunstad@dechert.com
Dechert LLP
90 State House Square
Hartford, CT  06103-3702
Telephone:  +1  860  524  3999
Facsimile:   +1  860  524  3930

Attorneys for Plaintiff / Counter-Defendant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re | USDC No. 8:01-CV-00097-DOC |
| VICKIE LYNN MARSHALL, | BANKR. No. 96-12510-PC, Ch. 11 |
| Debtor. | Adversary No. 2:96-AP-01838-SB |
| E. PIERCE MARSHALL, | |
| Plaintiff / Counter-Defendant, | Distr. Judge:  Hon. David O. Carter |
| v. | **NOTICE OF MOTION AND MOTION FOR ENTRY OF JUDGMENT IN FAVOR OF THE ESTATE OF E. PIERCE MARSHALL IN ACCORDANCE WITH THE NINTH CIRCUIT'S MANDATE;** |
| VICKIE LYNN MARSHALL, | |
| Defendant / Counter-Claimant. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | DATE:  **February 22, 2012** TIME:  **5:00 p.m.** PLACE:  411 West 4th Street Santa Ana, California |

Dechert LLP

**PLEASE TAKE NOTICE** that on **February 22, 2012** at **5:00 p.m.**, or as soon as the matter may be heard at the convenience of the Court, Plaintiff/Counter-Defendant Elaine T. Marshall ("Elaine"), in her capacity as Executrix of the Estate of E. Pierce Marshall ("Pierce's Estate"), shall bring on for hearing and does hereby move for Entry of Judgment in Favor of Pierce's Estate in accordance with the Ninth Circuit's mandate filed in this Court on September 14, 2011 (Dkt. No. 545) (attached as Exhibit "A").

Said Motion shall be based upon and is hereby based upon the Ninth Circuit's September 14, 2011 mandate; the Memorandum of Points and Authorities filed concurrently herewith; and upon all matters of which this Court may take judicial notice and such additional evidence and argument as may be presented at or before the hearing on said matter.

DATED: January 27, 2012                    Respectfully submitted,

                                           */s/ G. Eric Brunstad, Jr.*
                                           G. Eric Brunstad, Jr.
                                           Attorney for the Plaintiff / Counter-Defendant
                                           ELAINE T. MARSHALL

Dechert LLP

2

## MEMORANDUM OF POINTS AND AUTHORITIES

On June 23, 2011, the Supreme Court resolved the "long-running dispute between Vickie Lynn Marshall ["Vickie"] and E. Pierce Marshall ["Pierce"] over the fortune of J. Howard Marshall II ["J. Howard"]" by affirming the prior March 19, 2010 judgment of the Ninth Circuit. *Stern v. Marshall*, 131 S. Ct. 2594, 2600, 180 L. Ed. 475 (2011). On remand to the Court of Appeals, the Ninth Circuit issued its mandate on September 14, 2011, and its March 19, 2010 judgment took effect. Ex. A at 2. The March 19, 2010 judgment "reverse[d] the judgment of the district court and remand[ed this case] with instructions that judgment be entered in favor of the Estate of Pierce Marshall." *Id.* at 7. On remand to this Court, the Ninth Circuit's instruction is clear, and Elaine respectfully requests that the Court grant this Motion and enter judgment in this case in favor of Pierce's Estate.

## I.   Background.

As the Ninth Circuit explained, this case concerns a tort claim that Vickie brought against Pierce as a counterclaim to a nondischargeability complaint and proof of claim that Pierce filed in Vickie's bankruptcy proceedings in California. Ex. A at 5. Vickie alleged that Pierce had interfered with a substantial inter vivos gift that Vickie's late husband, J. Howard, had intended to give to her. *Id.* While Vickie's tortious interference claim was pending in the federal courts in California, a Texas probate court (the "Probate Court") was administering J. Howard's estate and determining the validity of J. Howard's Living Trust in Texas, which included

1

adjudication of all Vickie's parallel claims.  *Id.* at 6.

On December 29, 2000, the bankruptcy court entered a purported final judgment against Pierce in the amount of approximately $474 million.  *Id.* at 17-18. The Probate Court subsequently issued a final judgment in accordance with a jury verdict on August 15, 2001.  *Id.* at 20.  That judgment was amended and ultimately finalized on December 7, 2001.  *Id.*

As the Ninth Circuit explained, "[t]o discern J. Howard Marshall II's true intentions regarding his will and assets held in trust, the Texas probate court had to resolve allegations that J. Howard Marshall II's estate plan and the transactions underlying it were tainted by illegality and that, contrary to his estate plan, J. Howard Marshall II intended to give Vickie Lynn Marshall a substantial inter vivos gift."  *Id.* at 6.  The Ninth Circuit further explained that "[i]n its judgment . . . the Texas probate court upheld the validity of J. Howard Marshall's estate plan and estate planning documents, finding that J. Howard knowingly effected his estate plan free from the undue influence or coercion of his son Pierce Marshall."  *Id.*  The Probate Court also "found that J. Howard Marshall II did not intend to give Vickie Lynn Marshall a gift from the assets that passed through his will or that were held in his living trust."  *Id.*  As the Ninth Circuit recognized, "[t]hese and other legal and factual determinations adverse to Vickie Lynn Marshall would be fatal to her tortious interference counterclaim, should they be afforded preclusive effect in this proceeding."  *Id.*

Dechert LLP

2

On December 21, 2001, this Court denied Pierce's motion for summary judgment on claim and issue preclusion based on the Probate Court judgment. *Id.* at 22. This Court subsequently entered judgment in favor of Vickie on her tortious interference claim on March 7, 2002. On review, the Ninth Circuit "conclude[d] that the findings of the Texas probate court should be afforded preclusive effect because it is the earliest final judgment on matters relevant to this proceeding." *Id.* at 6. The Ninth Circuit agreed with this Court that the bankruptcy court did not have the authority to enter a final judgment on Vickie's counterclaim, and accordingly "the bankruptcy court could, at most, enter proposed findings of fact and conclusions of law on Vickie Lynn Marshall's counterclaim for tortious interference." *Id.* at 7. The Ninth Circuit reversed this Court, however, on the issue of preclusion, holding that this Court "should have afforded preclusive effect to the Texas probate court's factual findings and relevant legal conclusions." *Id.*

The Ninth Circuit held that "[t]he determinations adverse to Vickie Lynn Marshall in the Texas probate court prevent her from establishing the elements of her counterclaim, such as J. Howard Marshall II's intent to give her a substantial inter vivos gift, the tortious nature of Pierce Marshall's conduct regarding the estate planning documents, and the reasonableness and amount of her expectancy." *Id.* As a result, on March 19, 2010, the Ninth Circuit "reverse[d] the judgment of the district court and remand[ed] with instructions that judgment be entered in favor of the Estate of Pierce Marshall." *Id.*

On June 23, 2011, the Supreme Court affirmed the Ninth Circuit's decision. *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Thereafter, Stern filed with the Supreme Court a petition for rehearing requesting a stay of the appeal pending his pursuit of an appeal of the judgment of the Texas probate court. *Stern v. Marshall*, No. 10-179, 2011 WL 2790724 (U.S. July 14, 2011). On August 15, 2011, the Supreme Court denied Stern's request. *Stern v. Marshall*, 132 S. Ct. 56 (2011). Two days later, Stern filed a motion to stay the appeal with the Ninth Circuit, requesting the same relief that the Supreme Court had just rejected. *Marshall v. Stern (In re Marshall)*, No. 02-56002 [Dkt. No. 251] (9th Cir. Aug. 17, 2011). On September 14, 2011, the Ninth Circuit denied Stern's motion, *Marshall v. Stern (In re Marshall)*, No. 02-56002 [Dkt. No. 257] (9th Cir. Sept. 14, 2011), and issued its formal mandate stating that "[t]he judgment of this Court, entered March 19, 2010, takes effect this date." *Marshall v. Stern (In re Marshall)*, No. 02-56002 [Dkt. No. 258] (9th Cir. Sept. 14, 2011); Ex. A at 7. In accordance with the Ninth Circuit's March 19, 2010 judgment and the September 14, 2011 mandate, the Court of Appeals remanded this case to this Court with instructions that judgment be entered in favor of Pierce's Estate. *Marshall v. Stern (In re Marshall)*, No. 02-56002 [Dkt. No. 257] (9th Cir. Sept. 14, 2011); Ex. A at 7.

Dechert LLP

**II.    The Ninth Circuit's Mandate Is Clear, and This Court Should Enter Judgment in Favor of Pierce's Estate.**

As directed by the Court of Appeals, this Court should enter judgment in this case in favor of Pierce's Estate.   Under the "rule of mandate," a lower court is required to implement both the letter and the spirit of the mandate of an appellate court.  *Firth v. United States*, 554 F.2d 990, 993-94 & n.3 (9th Cir. 1977) ("When a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court.").  Where, as here, "the . . . mandate did not leave the matter open for reappraisal or clarification by the district court" but, to the contrary, directed that judgment be entered in favor of Pierce's Estate, the lower court must refuse to reevaluate issues on remand and must implement the higher court's mandate.  *Id.* at 994-95; *see also Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168, 59 S. Ct. 777 (1939) (The "general proposition . . . that [a lower court is] bound to carry the mandate of the upper court into execution and c[an] not consider the questions which the mandate laid at rest – is indisputable.");  *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S. Ct. 291 (1895) (a district court, upon receipt of an appellate court's mandate, "is bound by the decree as the law of the case, and must carry it into execution according to the mandate.  That court cannot vary it or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or

Dechert LLP

intermeddle with it, further than to settle so much as has been remanded.").

Where, as here, the mandate directs the district court to dismiss a case or enter judgment in favor of a party, no matter is left for further adjudication. For example, in *Stamper v. Baskerville*, the district court failed to comply with the Fourth Circuit's order to dismiss the claims at issue. 724 F.2d 1106, 1107 (4th Cir. 1984). On remand, the state attempted to press other matters before the district court that it argued had been "left open" by the mandate, and the district court entertained the arguments. On further appeal, the Fourth Circuit reversed and remanded, stating that "[w]e agree that the lower court may rule on matters left open by our mandate. We do not believe, however, that an order to dismiss leaves any matter open for further adjudication. Compliance with [the] order necessarily precludes the lower court from taking any further action other than dismissal, for to do so would involve retaining jurisdiction. Nor do we believe that *In re Sanford* should be read to permit a lower court to treat an issue not before the appellate court as 'a matter left open.' Were this the rule, a lower court could circumvent any and every order to dismiss simply by passing on an issue not present on appeal. A lower court may decide 'matters left open' only insofar as they reflect proceedings consistent with the appellate court's mandate. *See Quern v. Jordan*, 440 U.S. 332 [] (1979). Once an order to dismiss is received, any action by the lower court other than immediate and complete dismissal is by definition inconsistent with – and therefore a violation of – the order." *Stamper*, 724 F.2d at 1108.

Dechert LLP

It is just so here.  Pursuant to the Ninth Circuit's clear instruction, this Court should enter judgment in favor of Pierce's Estate in this matter and dismiss the case.  *See, e.g., Vizcaino v. United States District Court*, 173 F.3d 713, 719 (9th Cir.) ("When acting under an appellate court's mandate, an inferior court is bound by the decree as the law of the case."), *amended on other grounds on denial of reh'g*, 184 F.3d 1070 (9th Cir. 1999); *accord Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 (3d Cir. 1987) (on remand, "litigants should not be permitted to relitigate issues that they have already had a fair opportunity to contest") (internal quotation marks omitted); *Thornton v. Carter*, 109 F.2d 316, 319-20 (8th Cir. 1940) ("When a case has been decided by this court on appeal and remanded to the District Court, every question which was before this court and disposed of by its decree is finally settled and determined.  The District Court is bound by the decree and must carry it into execution according to the mandate.  It cannot alter it, examine it except for purposes of execution, or give any further or other relief or review it for apparent error with respect to any question decided on appeal, and can only enter a judgment or decree in strict compliance with the opinion and mandate. . . . . (The District Court) is without power to do anything which is contrary to either the letter or spirit of the mandate construed in the light of the opinion of this court deciding the case.") (footnote omitted).

The Ninth Circuit considered the arguments of the parties and in an extensive analysis ultimately held that because the bankruptcy court did not have jurisdiction

to enter a final order, the Probate Court's judgment was the "earliest final judgment" and was entitled to preclusive effect in this Court. Ex. A at 6. In light of that conclusion, the Ninth Circuit held that this Court "should have afforded preclusive effect to the Texas probate court's factual findings and relevant legal conclusions." *Id.* at 7. The Ninth Circuit further held that "[t]he determinations adverse to Vickie Lynn Marshall in the Texas probate court prevent her from establishing the elements of her counterclaim, such as J. Howard Marshall II's intent to give her a substantial inter vivos gift, the tortious nature of Pierce Marshall's conduct regarding the estate planning documents, and the reasonableness and amount of her expectancy." *Id.* Accordingly, on March 19, 2010, the Ninth Circuit "reverse[d] the judgment of [this Court] and remand[ed] with instructions that judgment be entered in favor of the Estate of Pierce Marshall." *Id.* After the Supreme Court affirmed the decision of the Ninth Circuit, the Ninth Circuit issued its mandate that its prior March 19, 2010 judgment took effect on September 14, 2011. *Id.* at 2. The Ninth Circuit's mandate is clear.

Dechert LLP

1

## <u>CONCLUSION</u>

2

3        For the foregoing reasons, Elaine T. Marshall, in her capacity as Executrix of

4    the Estate of E. Pierce Marshall, respectfully requests that this Court enter judgment

5    in favor of the Estate of Pierce Marshall.

6

7    Dated:      January 27, 2012                ELAINE T. MARSHALL, in her capacity
                                                 as Executrix of the Estate of E. Pierce
8                                                Marshall

9

10                                               By: /s/ G. Eric Brunstad, Jr.
                                                 _____
11                                                   G. Eric Brunstad, Jr.
                                                     (admitted *pro hac vice*)
12                                                   eric.brunstad@dechert.com
                                                     DECHERT LLP
13                                                   90 State House Square
                                                     Hartford, CT 06103
14                                                   Attorney for Plaintiff/
                                                     Counter-Defendant
15

16

17    14290360.2.LITIGATION

18

19

20

21

22

23

24

25

26

27

28

Dechert LLP

9

# EXHIBIT A

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 14 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

In the Matter of: VICKIE LYNN
MARSHALL,

        Debtor,

---

 ELAINE MARSHALL, as Independent
Executor of the Estate of E. Pierce
Marshall,

        Plaintiff - Appellant,

  v.

HOWARD K. STERN, as Executor
under the Will of Vickie Lynn Marshall,

        Defendant - Appellee.

No. 02-56002

D.C. No. CV-01-00097-DOC
U.S. District Court for Central
California, Santa Ana

**MANDATE**

RECEIVED
CLERK, U.S. DISTRICT COURT

SEP 1 4 2011

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

---

In the Matter of: VICKIE LYNN
MARSHALL,

        Debtor,

---

 ELAINE MARSHALL, as Independent
Executor of the Estate of E. Pierce
Marshall,

        Plaintiff - Appellee,

No. 02-56067

D.C. No. CV-01-00097-DOC
U.S. District Court for Central
California, Santa Ana

1

v.

HOWARD K. STERN, as Executor
under the Will of Vickie Lynn Marshall,

Defendant - Appellant.

The judgment of this Court, entered March 19, 2010, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Synitha Walker
Deputy Clerk

2

Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: VICKIE LYNN MARSHALL,
*Debtor.*

ELAINE T. MARSHALL, Executrix of
the Estate of E. Pierce Marshall,
*Plaintiff-Counter-Defendant/*
*Appellant-Cross-Appellee,*

v.

HOWARD K. STERN, Executor of the
Estate of Vickie Lynn Marshall,
*Defendant-Counter-Claimant/*
*Appellee-Cross-Appellant.*

Nos. 02-56002,
02-56067

D.C. No.
CV-01-00097-DOC
Central District of
California, Santa
Ana

OPINION

On Remand from the United States Supreme Court

Argued and Submitted
June 25, 2009—Seattle, Washington

Filed March 19, 2010

Before: Robert R. Beezer, Andrew J. Kleinfeld and
Richard A. Paez, Circuit Judges.

Opinion by Judge Beezer;
Concurrence by Judge Kleinfeld

## COUNSEL

G. Eric Brunstad, Jr., Dechert, LLP, Hartford, Connecticut, for the appellant-cross-appellee.

Kent L. Richland and Alan Diamond, Greines, Martin, Stein & Richland LLP, Los Angeles, California, for the appellee-cross-appellant.

Kathleen M. Sullivan, Quinn Emanuel Urquhart Oliver & Heges, LLP, Redwood Shores, California; Craig Goldblatt, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for the amici.

## OPINION

BEEZER, Circuit Judge:

This case returns to us after the Supreme Court determined that we had construed too broadly the "probate exception" to our subject matter jurisdiction. *Marshall v. Marshall*, 547 U.S. 293 (2006). Confident that we have subject matter jurisdiction over this case, *id.*; 28 U.S.C. § 1291, we turn to the merits of the longstanding and acrimonious dispute.

This case involves a tort claim by Vickie Lynn Marshall against E. Pierce Marshall, the son of her late husband J. Howard Marshall II, for Pierce Marshall's purported interference with a substantial inter vivos gift (estimated to exceed $300 million) that her late husband intended to give to her. The claim comes to us in an unusual procedural posture. It was asserted as a state law counterclaim to a nondischargeability complaint and proof of claim that Pierce Marshall filed in Vickie Lynn Marshall's bankruptcy proceedings in the Central District of California. Both the bankruptcy and district courts found that Pierce Marshall was liable for tortious interference and awarded Vickie Lynn Marshall millions of dollars in compensatory and punitive damages.

While Vickie Lynn Marshall's tortious interference claim was pending in federal court in California, a probate court in

Texas was administering the estate of J. Howard Marshall II. Both Vickie Lynn Marshall and Pierce Marshall were actively engaged in this Texas litigation, participating fully in the five-month jury trial held by the Texas probate court. To discern J. Howard Marshall II's true intentions regarding his will and assets held in trust, the Texas probate court had to resolve allegations that J. Howard Marshall II's estate plan and the transactions underlying it were tainted by illegality and that, contrary to his estate plan, J. Howard Marshall II intended to give Vickie Lynn Marshall a substantial inter vivos gift. In its judgment, which was issued after the bankruptcy court's "judgment" on Vickie Lynn Marshall's tortious interference claim but before the district court had adjudicated the appeal from the bankruptcy court, the Texas probate court upheld the validity of J. Howard Marshall's estate plan and estate planning documents, finding that J. Howard knowingly effected his estate plan free from the undue influence or coercion of his son Pierce Marshall. The Texas probate court further found that J. Howard Marshall II did not intend to give Vickie Lynn Marshall a gift from the assets that passed through his will or that were held in his living trust. These and other legal and factual determinations adverse to Vickie Lynn Marshall would be fatal to her tortious interference counterclaim, should they be afforded preclusive effect in this proceeding.

We conclude that the findings of the Texas probate court should be afforded preclusive effect because it is the earliest final judgment on matters relevant to this proceeding. The bankruptcy court exceeded its statutory grant of power and the constitutional limitations on that power when it purported to enter a final judgment in favor of Vickie Lynn Marshall on her counterclaim. The bankruptcy court is empowered by 28 U.S.C. § 157(b)(1) to hear and finally determine "core proceedings arising under title 11, or arising in a case under title 11." Vickie Lynn Marshall's counterclaim for tortious interference is not such a "core proceeding" because its resolution was not a necessary precursor to the resolution of Pierce Marshall's claim against the bankruptcy estate for defamation. In

other words, her counterclaim was not so closely related to his claim that they essentially merged, with her counterclaim becoming part and parcel of the bankruptcy court's claims determination and allowance process. Thus, the bankruptcy court could, at most, enter proposed findings of fact and conclusions of law on Vickie Lynn Marshall's counterclaim for tortious interference. *See* 28 U.S.C. § 157(c).

The district court should have afforded preclusive effect to the Texas probate court's factual findings and relevant legal conclusions. The determinations adverse to Vickie Lynn Marshall in the Texas probate court prevent her from establishing the elements of her counterclaim, such as J. Howard Marshall II's intent to give her a substantial inter vivos gift, the tortious nature of Pierce Marshall's conduct regarding the estate planning documents, and the reasonableness and amount of her expectancy. We reverse the judgment of the district court and remand with instructions that judgment be entered in favor of the Estate of Pierce Marshall.

## I

This case arises out of the bankruptcy of appellee/cross-appellant Vickie Lynn Marshall, the widow of the late J. Howard Marshall II. During the course of her bankruptcy, Vickie Lynn Marshall made a counterclaim for tortious interference with a gift expectancy against appellant/cross-appellee E. Pierce Marshall, the younger of J. Howard Marshall II's two sons, who had sought a determination of nondischargeability and filed a proof of claim against Vickie Lynn Marshall's bankruptcy estate.[1] Vickie Lynn Marshall's coun-

---

[1]Both of the original parties are now themselves deceased. Elaine T. Marshall is the executrix of Pierce Marshall's estate and has filed a notice of appearance in this court on behalf of his estate. Howard K. Stern is the executor of Vickie Lynn Marshall's estate and has filed a notice of appearance in this court on behalf of her estate. For the sake of readability, we refer to Vickie Lynn Marshall and Pierce Marshall in the present tense as if they are still living and are still the current parties.

terclaim is the focus of this appeal. Although the case arises out of her bankruptcy, a broader review of the relationships between Vickie Lynn Marshall, J. Howard Marshall II, and Pierce Marshall, the business and estate planning measures of J. Howard Marshall II, and the Texas probate proceeding is necessary to appreciate the issues before us.

A

As detailed by the district court, J. Howard Marshall II was a self-made entrepreneur who eventually found great success in the oil industry. Born in 1905, J. Howard Marshall II attended Haverford College and graduated *magna cum laude* from Yale Law School before working during the 1930s for the Roosevelt Administration on the proration of oil production. After continued involvement in the oil industry, J. Howard Marshall II became one of the founders of the Great Northern Oil and Gas Company in 1954. The wealth of the Marshall family is primarily based on the interest acquired

---

Additionally, on March 19, 2009, we ordered the parties to "identify (1) all parties in interest, (2) the attorneys of record, (3) the real parties in interest, (4) any executors of an estate having an interest in these proceedings and (5) any guardian and/or guardian ad litem of an interested minor." Both parties filed responses to our order stating that the correct parties are currently before us. No third party has sought to intervene in this appeal.

The interests of Vickie Lynn Marshall's minor daughter, "DB," are represented by DB's father and legal guardian, Larry E. Birkhead, as determined by the Los Angeles Superior Court in *In re Vickie Lynn Marshall*, Case Nos. BP-104574, BP-104575. Mr. Birkhead had notice of these proceedings, attended oral argument, and at no time sought to intervene as a party on behalf of his daughter. Under California law, the executor or administrator of an estate is the real party in interest. *See Olson v. Toy*, 54 Cal. Rptr. 2d 29, 33 (Ct. App. 1996). Both parties here agreed that we did not need to appoint a guardian ad litem for DB, but that her interests in this proceeding were adequately represented by Mr. Birkhead and Mr. Stern. *See* Supplemental Opening Br. filed by Elaine Marshall at 58; Supplemental Answering Br. filed by Howard Stern at 66.

by J. Howard Marshall II in Great Northern Oil and Gas, which was the predecessor company to Koch Industries.[2]

In 1982, as an estate planning mechanism to reduce (or avoid) the cost of probate, J. Howard Marshall II placed almost all of his assets (including his interest in Marshall Associates, the family partnership that then held the Koch stock) in a revocable inter vivos trust, known as the J. Howard Marshall II Living Trust, or the Living Trust.[3] From 1982 until his death, J. Howard Marshall II executed a series of amended and restated instruments governing the terms of the Living Trust.

During his lifetime, J. Howard Marshall II retained the income from the Living Trust's assets, and the Living Trust was responsible for his debts. The terms of the Living Trust permitted J. Howard Marshall II to borrow money using the Living Trust's assets as security. Although the distributions from the Living Trust were his primary source of income, J. Howard Marshall II also drew a salary from Marshall Petroleum, Inc. (MPI), earned directors' fees from the corporate boards of which he was a member, and received minor pension payments.

The Living Trust also named the beneficiaries who would receive the Living Trust property after J. Howard Marshall

---

[2]Koch Industries (Koch) is a privately held, integrated petroleum and chemical conglomerate headquartered in Wichita, Kansas. *See Marshall v. Marshall* (*In re Marshall*), 275 B.R. 5, 13-16 (C.D. Cal. 2002) (describing in greater detail the creation and ownership of Koch Industries). In 1995, J. Howard Marshall II represented to Texas Commerce Bank that, through entities he controlled, he owned 14.7 percent of Koch. *Id.* at 15.

[3]For some time, the shares of Koch stock were held by Marshall Associates. In 1984, the Koch stock and other assets owned by Marshall Associates were transferred to Marshall Petroleum, Inc. (MPI), a corporate entity created by J. Howard Marshall II and his first and second wives. The Living Trust also held J. Howard Marshall II's shares of MPI stock after its creation.

II's death. At the time J. Howard Marshall II died, the primary beneficiary of the Living Trust was Pierce Marshall.[4]

Also as part of his estate planning measures, J. Howard Marshall II executed a will that provided for the disposition of the assets that he held directly, i.e., not in the Living Trust or any other form of trust. J. Howard Marshall II executed his last will and testament relevant to these proceedings on December 22, 1992. This will contained pour-over provisions, which required the distribution of J. Howard Marshall II's probate estate to the Living Trust. Thus, the Living Trust was J. Howard Marshall II's primary estate planning document. Also in 1992, J. Howard Marshall II signed a document requesting that Pierce Marshall be appointed his guardian if a guardianship was ever warranted.

At the time J. Howard Marshall II met Vickie Lynn Marshall, essentially all of his assets were held by the Living Trust. J. Howard Marshall II modified his Living Trust for the last time on July 13, 1994, just a few days after his marriage. On that date, J. Howard Marshall II made the Living Trust irrevocable.[5]

B

J. Howard Marshall II met Vickie Lynn (Smith) Marshall in October 1991. At the time, Vickie Lynn was a twenty-four year old divorcee and single mother living in Houston, Texas.

---

[4]Minor distributions from the Living Trust would also be made to various charities and family beneficiaries upon J. Howard Marshall II's death.

[5]J. Howard Marshall II did, however, retain the limited power to make certain changes such as adding a charity as a beneficiary or substituting one beneficiary for another, as long as the beneficiary that was being substituted was already a beneficiary as of July 13, 1994. Thus, J. Howard Marshall II could have eliminated Pierce Marshall as a beneficiary of the Living Trust by substituting a charity in his place. J. Howard Marshall II could not, however, have added either his new wife or elder son as beneficiaries because they were not already beneficiaries as of July 13, 1994.

She worked as a waitress and dancer to provide for her son, but she aspired to become an international superstar like her idol Marilyn Monroe. After a courtship lasting more than two years, J. Howard Marshall II and Vickie Lynn Marshall married on June 27, 1994.

Their union was short lived: J. Howard Marshall II died on August 4, 1995, of heart failure at the age of ninety. Although he lavished gifts and significant sums of money on Vickie Lynn Marshall during their courtship and marriage,[6] J. Howard Marshall II did not devise any real or personal property to her in his will, nor was a provision for distribution of income or principal of the Living Trust ever made in her favor. Similarly, J. Howard Marshall II did not give Vickie Lynn Marshall any interest in his business assets or stock holdings.

## C

In April 1995, before J. Howard Marshall II had died, Vickie Lynn Marshall filed suit against Pierce Marshall and others in Texas probate court, which was handling guardianship proceedings relating to J. Howard Marshall II. She alleged that Pierce Marshall was tortiously interfering with her statutory right to support from her husband and that Pierce Marshall had breached his fiduciary duties as a trustee of the Living Trust. She also asserted that Pierce Marshall used fraud and undue influence to have J. Howard Marshall II make the Living Trust irrevocable and make other estate plan-

---

[6]On September 29, 1994, J. Howard Marshall II transferred gifts to Vickie Lynn Marshall out of his love and affection for her as his new wife. These gifts were valued at more than $6 million and included a ranch, several houses, cars, jewelry, and a substantial amount of cash. The gifts were memorialized in a document called the "Act of Donation." Vickie Lynn Marshall accepted these gifts on October 27, 1994.

J. Howard Marshall II also took steps to promote Vickie Lynn Marshall's career as a model.

ning changes that favored Pierce Marshall. By way of relief, Vickie Lynn Marshall sought the level of support to which she had become accustomed, a declaration from the court that J. Howard Marshall II was a beneficiary of the Living Trust, and the removal of Pierce Marshall from certain fiduciary capacities with respect to his father and his father's assets.

In August 1995, three days after J. Howard Marshall II died, Vickie Lynn Marshall added an application in the Texas probate court requesting that the court find that J. Howard Marshall II died intestate. Pierce Marshall opposed this application and petitioned for a declaration that his father's Living Trust and will were valid. Pierce Marshall offered J. Howard Marshall II's will for probate on August 16, 1995.

J. Howard Marshall III, J. Howard Marshall II's elder son, filed a will contest on December 20, 1995.[7] On January 23, 1998, Vickie Lynn Marshall joined this will contest. Several other individuals and institutional claimants brought actions seeking a share of J. Howard Marshall II's estate, but none are parties to this appeal.

By a third amended petition dated January 4, 2000, Vickie Lynn Marshall alleged that Pierce Marshall in his representative capacities, his attorneys, and others tortiously interfered with her expectation based upon her belief that J. Howard Marshall II had made oral promises to give her gifts both during his lifetime and upon his death.[8] In her third amended

---

[7]In 1980, J. Howard Marshall II and J. Howard Marshall III disagreed about the management of Koch Industries, and J. Howard Marshall III threatened to vote his father off the Board of Directors. To prevent this, J. Howard Marshall II bought the Koch stock back from J. Howard Marshall III for $8 million, an amount J. Howard Marshall II considered to be an exorbitant premium for stock he had gifted to his son years earlier. Following this dispute, J. Howard Marshall II changed his estate plan to exclude his elder son as a beneficiary under his will and Living Trust.

[8]Some of Vickie Lynn Marshall's claims in her third amended petition were made against Pierce Marshall in his individual capacity; because of the bankruptcy proceeding in California, however, Vickie Lynn Marshall limited her tortious interference claim in the Texas probate court to Pierce Marshall in his representative capacities.

petition, Vickie Lynn Marshall again challenged the validity of both the Living Trust, as amended, and J. Howard Marshall II's will.

### D

After the Texas proceedings had commenced, but before she had filed her amended petition and will contest in that forum, Vickie Lynn Marshall filed for protection under federal bankruptcy laws in California, the state of which she claimed to be a resident. Vickie Lynn Marshall filed a voluntary chapter 11 bankruptcy petition in the United States District Court for the Central District of California on January 25, 1996. At this point, all non-exempt assets owned by Vickie Lynn Marshall, including her claims against J. Howard Marshall II's estate and against Pierce Marshall, constituted the bankruptcy estate.[9] See 11 U.S.C. § 541.

On May 7, 1996, Pierce Marshall commenced an adversary proceeding in the bankruptcy court seeking a declaration that in the event Vickie Lynn Marshall were to be found liable to Pierce Marshall for earlier instances of alleged defamation, her liability to him would not be dischargeable in her bankruptcy proceeding.[10] See 11 U.S.C. § 523(a)(6). Specifically, Pierce Marshall filed a "complaint to determine dischargeability of debt pursuant to 11 U.S.C. § 523(a)(6)," in which he alleged that after J. Howard Marshall II's death Vickie Lynn Marshall and her attorneys "instituted a plan to obtain a quick recovery from the estate of J. Howard Marshall II by embark-

---

[9]Although certain interested parties sought to have a trustee appointed to oversee Vickie Lynn Marshall's bankruptcy estate, the bankruptcy court denied the request. Instead, the bankruptcy court appointed an examiner to investigate all of Vickie Lynn Marshall's transactions and financial affairs and allowed Vickie Lynn Marshall to remain a "debtor in possession," holding her assets for the benefit of the bankruptcy estate.

[10]Pierce Marshall had filed suit against Vickie Lynn Marshall and her two attorneys in Texas court, but he dismissed Vickie Lynn Marshall from the suit without prejudice after she filed for bankruptcy.

ing on a tortious smear campaign against E. Pierce Marshall and his family." According to the complaint, Vickie Lynn Marshall's attorney expressed concern to a member of the press about the "blizzard of documents" that Pierce Marshall presented to his father in the days following his marriage to Vickie Lynn Marshall, noting that J. Howard Marshall II "signed [the documents] in an almost completely illegible fashion, which makes sense because he couldn't read at the time" and that "[t]he effect of it was basically an attempt to remove [J. Howard Marshall II] from control of his estate." The attorney further told a member of the press that "the law clearly entitles [Vickie Lynn Marshall] to half of whatever her late husband earned during the marriage" and described Pierce Marshall as "greedy and miserly" and a "real control freak." The complaint further alleges that the attorney knew the documents had been validly executed and effected J. Howard Marshall II's estate planning wishes, but nevertheless suggested in the media that Pierce Marshall had engaged in one or more criminal acts in an effort to obtain his father's property. It also alleges that Vickie Lynn Marshall knew of the smear campaign efforts and in fact "participated in the civil conspiracy in an effort to extort a speedy settlement." By way of relief, Pierce Marshall specifically sought the following:

> 1. A determination that [Pierce Marshall's] claims against [Vickie Lynn Marshall] have not been discharged; 2. An order granting [Pierce Marshall] recovery for his reasonable costs and attorney's fees incurred herein and pre- and post-judgment interest as allowed by law; and 3. An order granting [Pierce Marshall] such other relief as is just.

On June 12, 1996, Pierce Marshall filed a proof of claim against Vickie Lynn Marshall's bankruptcy estate seeking an unliquidated amount of damages for his unsecured nonpriority claim arising from the alleged defamation. Attached to his proof of claim as "exhibit A" was his previously filed "com-

plaint to determine dischargeability of debt pursuant to 11 U.S.C. § 523(a)(6)."[11] Two days later, on June 14, 1996, Vickie Lynn Marshall's bankruptcy estate filed an answer to Pierce Marshall's nondischargeability complaint asserting a number of affirmative defenses, an objection to Pierce Marshall's creditor's claim, and counterclaims against Pierce Marshall in his individual capacity. Vickie Lynn Marshall asserted as an affirmative defense that "the statements complained of in this action are in fact substantially true, in whole and in part, and therefore cannot form the basis of a [defamation claim]."[12] Vickie Lynn Marshall's counterclaims included: tortious interference with her expectation of a gift or inheritance from J. Howard Marshall II; tortious interference with her rights as J. Howard Marshall II's spouse; breach of fiduciary duty; fraudulent transfer of J. Howard Marshall II's assets; abuse of the legal process; imprisoning J. Howard Marshall II against his will; breach of agreement and contract;

---

[11]Pierce Marshall argues to us that he did not actually make a claim against Vickie Lynn Marshall's estate and, instead, sought only a determination of dischargeability. Like the district court, we, too, reject this argument. *See Marshall v. Marshall (In re Marshall)*, 264 B.R. 609, 629 (C.D. Cal. 2001). Pierce Marshall plainly filed a nondischargeability complaint, and then, more than a month later, he made a separate claim against the bankruptcy estate by filing his proof of claim for an unspecified amount of damages. Had he simply desired a nondischargeability determination, there would have been no reason to file a proof of claim seeking damages on the underlying defamation claim.

[12]She also asserted as an affirmative defense that:

> [The statements] were made in good faith, honestly, and not maliciously in that the signatures of J. Howard Marshall, II on the several documents allegedly signed by him shortly after his marriage to Mrs. Marshall were almost completely illegible; the physician of J. Howard Marshall, II has declared that [J. Howard Marshall II] could not read the typeface of the size used in the several documents at issue; the several documents allegedly signed by J. Howard Marshall, II did purport to give [Pierce Marshall] full control over the . . . Living Trust; and the several documents did purport to have the effect of transferring control over Mr. Marshall's estate.

and fraud, duress, and undue influence over J. Howard Marshall II.

Pierce Marshall moved to dismiss the counterclaims based on jurisdiction and also moved for the bankruptcy court to abstain from hearing the tortious interference claim. The bankruptcy court denied both motions.

Vickie Lynn Marshall entered into a settlement with her creditors, and the bankruptcy court confirmed Vickie Lynn Marshall's chapter 11 plan of reorganization on March 8, 1999.[13] The reorganization plan specifically provided that any proceeds from "disputed claims/interests" determined in Vickie Lynn Marshall's favor would be held by a disbursing agent to first satisfy creditors' claims, with any remaining amounts then going to Vickie Lynn Marshall. The reorganization plan also discussed the specific disbursement process for the "Marshall Claims," defined as those in the adversary proceeding initiated by Pierce Marshall.[14] In the order confirming the plan, the bankruptcy court discharged Vickie Lynn Marshall's preexisting debts and caused the property remaining in the bankruptcy estate to be revested in her.

Trial of the adversary proceeding began on October 27, 1999. *Marshall v. Marshall (In re Marshall)*, 253 B.R. 550, 553 (Bankr. C.D. Cal. 2000). On November 5, 1999, the bankruptcy court granted summary judgment for Vickie Lynn Marshall on Pierce Marshall's adversary complaint, concluding that she did not publish or ratify any defamatory statements about him. *Marshall v. Marshall (In re Marshall)*, 275 B.R. 5, 9 (C.D. Cal. 2002).

---

[13]This order was the subject of a separate appeal in this court. *Marshall v. Marshall (In re Marshall)*, 119 F. App'x 136 (9th Cir. 2004).

[14]A complaint to determine the discharge of a debt coupled with an objection to a creditor's claim is an adversary proceeding. *See* Fed. R. Bankr. P. 3007, 7001.

IN RE MARSHALL

On September 27, 2000, the bankruptcy court found that Pierce Marshall had tortiously interfered with Vickie Lynn Marshall's expectation that she would inherit from J. Howard Marshall II's estate.[15] The bankruptcy court reasoned that a "widow's election" under Texas law supported a monetary judgment.[16] The court awarded Vickie Lynn Marshall $449,754,134, but stated that the final calculation of damages remained to be determined after completion of the Texas probate action.

On October 6, 2000, the bankruptcy court entered a revised judgment against Pierce Marshall in his individual capacity, again for $449,754,134, less whatever proceeds Vickie Lynn Marshall received from J. Howard Marshall II's estate. In its revised judgment the bankruptcy court did not rely on Vickie Lynn Marshall's "widow's election," but concluded based upon "a preponderance of the evidence admitted at trial and the findings imposed as sanctions against Pierce Marshall for discovery abuses, that Pierce . . . tortiously deprived [Vickie Lynn Marshall] of her expectancy of a substantial *inter vivos* gift from her deceased husband."[17] On December 29, 2000,

---

[15]The bankruptcy court entered a ruling only on Vickie Lynn Marshall's claim for tortious interference with her expectation of a gift. It does not appear that the bankruptcy court ever entered a ruling addressing Vickie Lynn Marshall's other various claims. Vickie Lynn Marshall did not appeal the bankruptcy court's judgment; thus, the claims that she abandoned would now seem to be barred.

[16]Vickie Lynn Marshall's community property interest in J. Howard Marshall II's income from his separate property was approximately $1 million. Because J. Howard Marshall II gifted her property during their marriage in excess of this amount, Vickie Lynn Marshall did not file a community property claim.

[17]The bankruptcy court imposed various sanctions on Pierce Marshall for perceived discovery abuses. These sanctions included, in addition to factual findings made against him, limiting Pierce Marshall's ability to introduce percipient witnesses and present certain evidence on the merits of the claims levied against him. Our discussion of these matters will be limited because the parties agreed that there are no sanctions issues before us on appeal.

the bankruptcy court entered a judgment against Pierce Marshall in the amount of $474,754,134. A timely appeal of this ruling to the federal district court followed.

### E

Proceedings in the Texas probate court continued unabated during Vickie Lynn Marshall's bankruptcy in California. On January 5, 2001, days after the bankruptcy court entered its judgment, Vickie Lynn Marshall filed a voluntary nonsuit of all her claims against Pierce Marshall in the Texas probate proceeding. The probate judge explained to Vickie Lynn Marshall's counsel that, by doing so, she would be giving up any claim to money that was in her late husband's estate and any claim that the Living Trust or will were invalid. The Texas probate judge warned her in open court as follows:

> Even if you take a nonsuit, which under the Rules of Civil Procedure give you a right to refile it, as a practical matter you don't, because the Estate is gone. . . . Your claim to anything that [J. Howard Marshall II] had at any time in his life is over when this final judgment is signed. The fact that the Rules of Civil Procedure allow you to take a nonsuit and re-file later doesn't really apply in Probate Court when we're talking about who is entitled to an Estate.

Despite the probate court's warnings, and in apparent reliance

---

We further note that, when it took additional evidence on the case, the district court likewise limited to some extent the testimony and evidence Pierce Marshall was able to introduce. Pierce Marshall claims that the district court violated his due process rights with this ruling and other evidentiary decisions. Because we conclude that Pierce Marshall is entitled to judgment in his favor for other reasons, we need not address his due process claim.

on her belief that the bankruptcy court had the authority to enter a final judgment on the counterclaim against Pierce Marshall, Vickie Lynn Marshall elected to dismiss her claims against J. Howard Marshall II's estate and against Pierce Marshall both individually and in his representative capacities.[18]

On February 9, 2001, with the leave of the Texas probate court, Pierce Marshall filed an amended counterclaim against Vickie Lynn Marshall for declaratory relief to determine her rights as to the estate and property of J. Howard Marshall II. Pierce Marshall also sought a declaratory judgment against Vickie Lynn Marshall and J. Howard Marshall III that J. Howard Marshall II's Living Trust and will reflected his true intentions and were valid. Thus, Vickie Lynn Marshall remained in the probate proceedings as a defendant to Pierce Marshall's counterclaims. The Texas probate court held a five-month jury trial in which all parties, including Vickie Lynn Marshall, fully participated.[19] On March 7, 2001, the Texas jury returned its verdict. The jury unanimously answered a number of special verdict questions, making the following factual findings: (1) the Living Trust and will were valid and had not been forged or altered; (2) J. Howard Marshall II had not been the victim of fraud or undue influence; (3) he had the requisite mental capacity when he executed his

---

[18]Vickie Lynn Marshall also moved to dismiss other counterclaims against her in the Texas probate court, but the probate court denied her motion.

[19]Vickie Lynn Marshall vigorously argued against the validity of the Living Trust in the Texas probate court. For example, prior to trial, Vickie Lynn Marshall submitted her preliminary proposed jury interrogatories, which included instructions and jury queries on tortious interference with a gift expectancy and on fraud, duress, and undue influence. In his opening statement, Vickie Lynn Marshall's counsel explained to the jury that this was a case "about tortious interference with an intent to give an *inter vivos* gift." He told the jury Vickie Lynn Marshall would testify that J. Howard Marshall II promised her "half of everything that he had." Vickie Lynn Marshall presented her case in chief in great detail over approximately 60 hours. After she nonsuited her affirmative claims, she continued to defend against Pierce Marshall's counterclaims.

Living Trust and will; and (4) he did not have an agreement with Vickie Lynn Marshall that he would give her one-half of all his property.

The Texas probate court entered a final judgment in accordance with the jury's verdict on August 15, 2001. Subsequently, the probate court amended its judgment on two occasions, the last being entered on December 7, 2001. In the second amended judgement, the Texas probate court found that the will and Living Trust, as amended, were valid and not the product of undue influence. The probate court concluded as a matter of law:

> that Vickie Lynn Marshall does not possess any interest in and is not entitled to possession of any property within the estate of J. Howard Marshall II or [the Living Trust] because of any representations, promises or agreements made by J. Howard Marshall II; . . .

> that any and all claims that have been or should have been asserted by Vickie Lynn Marshall . . . based upon alleged representations, promises, or agreements made by J. Howard Marshall II to or with Vickie Lynn Marshall . . . have been disposed of in this proceeding; . . .

> that J. Howard Marshall did not intend to give and did not give to Vickie Lynn Marshall . . . a gift or bequest from the Estate of J. Howard Marshall II or from the [Living Trust] either prior to or upon his death; . . .

> that Vickie Lynn Marshall . . . shall take nothing from any claim that she should have made in this proceeding as a compulsory counterclaim against . . . E. Pierce Marshall.

Accordingly, the Texas probate court entered judgment in favor of Pierce Marshall on all claims and held that Pierce Marshall was entitled to his inheritance, free from all claims by Vickie Lynn Marshall or J. Howard Marshall III.

## F

Pierce Marshall appealed the bankruptcy court's judgment to the district court, which asserted original bankruptcy jurisdiction. 28 U.S.C. § 1334. After the Texas probate court entered its final judgment, Pierce Marshall moved to dismiss Vickie Lynn Marshall's claims against him in the district court based on principles of claim and issue preclusion.

On June 19, 2001, the district court issued an opinion and order affirming the bankruptcy court's determination that it had federal jurisdiction over Vickie Lynn Marshall's claim of tortious interference with the expectation of a gift. *Marshall v. Marshall (In re Marshall)*, 264 B.R. 609, 619-21 (C.D. Cal. 2001). The district court also held that the Texas probate court had not ruled on Vickie Lynn Marshall's claim against Pierce Marshall in his individual capacity. *See id.* at 621-24, 633 & n.24. The district court went on to reverse the bankruptcy court's determination that the bankruptcy court could enter a final judgment on the claim as a "core" bankruptcy proceeding. *Id.* at 632-33. The district court recognized that Vickie Lynn Marshall's claim arguably arose out of the same factual transaction as that of Pierce Marshall, but it reasoned that the "connection [was] attenuated" and "the reasons for why counterclaims arising out of the same transaction should usually be considered core do not apply." *Id.* at 631-32. The court explained that the attenuated factual nexus between the claims, the different legal theories underlying the claims, the fact that Vickie Lynn Marshall's claim dwarfed Pierce Marshall's claim in terms of recovery sought and evidence required to establish it, and Ninth Circuit jurisprudence cautioning courts to avoid characterizing a proceeding as core if to do so would raise constitutional problems, all counseled in

favor of classifying Vickie Lynn Marshall's counterclaim as
non-core. *Id.* at 625-32. Because bankruptcy courts may only
issue proposed findings of fact and conclusions of law in non-
core matters (absent the parties' consent), the district court
vacated the bankruptcy court's entry of judgment. *Id.* at
632-33.

On December 21, 2001, the district court denied Pierce
Marshall's motion for summary judgment based on claim and
issue preclusion. *Marshall v. Marshall (In re Marshall)*, 271
B.R. 858 (C.D. Cal. 2001).

After receiving additional evidence on Vickie Lynn Mar-
shall's claim, the district court entered judgment in her favor
on March 7, 2002. The district court found that "J. Howard
always intended to give Vickie . . . half of his 'new communi-
ty,' " a term he created to mean the growth of his assets dur-
ing the time of their marriage. *In re Marshall*, 275 B.R. at 29
& n.19, 52. The district court found that the circumstantial
evidence before it "sufficiently establishes the existence of a
draft 'catchall trust' instrument" prepared by J. Howard Mar-
shall II's attorney as a means of effecting this gift of new
community. *Id.* at 26-29, 26 n.17. The district court further
found that Pierce Marshall, in concert with an attorney,
"backdated documents, altered documents, destroyed docu-
ments, suborned falsified notary statements, presented docu-
ments to [J. Howard Marshall II] under false pretenses, and
committed perjury," all in an effort to prevent his father from
giving this gift of new community to Vickie Lynn Marshall.
*Id.* at 53. The district court found that J. Howard Marshall II
was "duped" by this fraudulent conduct into making various
estate planning changes, such as making the Living Trust
irrevocable. *See id.* at 42-50. Based on this and other factual
findings, the district court determined that Pierce Marshall
had tortiously interfered with Vickie Lynn Marshall's expec-
tancy of an inter vivos gift from J. Howard Marshall II. *Id.* at
58.

The district court awarded Vickie Lynn Marshall damages based upon what it believed she would have received as a gift from J. Howard Marshall II, absent the purported interference. The award consisted of $44,292,767.33 in compensatory damages and an equal amount in punitive damages, for a total of $88,585,534.66, plus costs of suit. *In re Marshall*, 275 B.R. at 58.

G

Pierce Marshall appealed the district court's judgment, and Vickie Lynn Marshall cross-appealed. Believing that the probate exception to federal subject matter jurisdiction precluded our consideration of the case, we vacated the judgment and remanded with instructions that the district court order the bankruptcy court to vacate its judgment against Pierce Marshall. *Marshall v. Marshall (In re Marshall)*, 392 F.3d 1118, 1137-39 (9th Cir. 2004).

The United States Supreme Court granted certiorari "to resolve the apparent confusion among federal courts concerning the scope of the probate exception." *Marshall v. Marshall*, 547 U.S. 293, 305 (2006). The Supreme Court concluded that the probate exception did not apply, reversed our decision, and remanded for us to consider the merits of the case, including the question "whether Vickie's claim was 'core' " and "Pierce's arguments concerning claim and issue preclusion." *Id.* at 314-15; *see also id.* at 313 n.5 (discussing Texas appellate cases that found tortious interference claims to be "barred" after "applying ordinary principles of preclusion" and stating that, in this case, the "matter of preclusion remains open on remand").

We ordered supplemental briefing on these and other issues and held oral argument on June 25, 2009.[20]

---

[20]In addition to the supplemental briefs filed by the parties, we also received two thoughtful amicus briefs filed in support of Pierce Marshall.

## II

We review de novo questions of law." *Forest Grove Sch. Dist. v. T.A.*, 523 F.3d 1078, 1083 (9th Cir. 2008); *see In re Valdez Fisheries Dev. Ass'n, Inc.*, 439 F.3d 545, 547 (9th Cir. 2006) (bankruptcy court's determination of its jurisdiction); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (issue preclusion); *Siegel v. Fed. Home Loan Mortgage Corp.*, 143 F.3d 525, 528 (9th Cir. 1998) (claim preclusion). We review a district court's findings of fact for clear error, reversing only if "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001).

## III

Pierce Marshall argues that the district court correctly concluded that Vickie Lynn Marshall's tortious interference counterclaim was a non-core proceeding for which the bankruptcy court could issue only proposed findings of fact and conclusions of law. Pierce Marshall further argues that the district court erred, however, when it refused to give any preclusive effect to the Texas probate court's judgment, which was issued while the case was pending before the district court. Vickie Lynn Marshall responds by arguing that her counterclaim is a core proceeding, that the bankruptcy court properly entered a final judgment on it well before the Texas probate court's judgment, and that preclusion principles therefore do not apply.

---

The first brief, filed by Professors of Law S. Todd Brown, G. Marcus Cole, Ronald D. Rotunda, and Todd J. Zywicki, discusses "the proper distinction between 'core' and 'non-core' bankruptcy proceedings—and the application of that distinction to counterclaims like the one in this case." Professors' Amicus Br. at 2. The second brief, filed by the Washington Legal Foundation, explained its concern "that the district court's refusal to give preclusive effect to the Texas judgment undermines the principles of federalism and contravenes the Full Faith and Credit Act." Wash. Legal Found. Amicus Br. at 1.

### A

For parties whose views seldom correspond, both sides appear to share the position that the determination whether Vickie Lynn Marshall's counterclaim is "core" or "non-core" is central to the disposition of this case and will affect the manner in which our analysis proceeds. We agree. For the reasons detailed below, we conclude that Vickie Lynn Marshall's counterclaim is a non-core proceeding that is, at most, related to her bankruptcy case.

### 1

In an article discussing the Bankruptcy Code, Professor Vern Countryman wrote, "To understand how we got where we are, it is necessary to understand where we were." Vern Countryman, *Scrambling to Define Bankruptcy Jurisdiction*, 22 Harv. J. on Legis. 1, 2 (1985). This statement holds true today: one must have some familiarity with the evolution of the current bankruptcy regime in order to appreciate the important distinctions between "arising under," "arising in," and "related to" proceedings and how the notion of "core" proceedings came to exist.

The Bankruptcy Act of 1898 is the basis for modern bankruptcy law. 30 Stat. 544 (repealed 1979); *see* Collier on Bankruptcy ¶ 1.0[1] (15th Ed. Revised 2007). It designated the district courts as the "courts of bankruptcy" and created the office of the referee to assist the district courts in the discharge of their duties. Bankruptcy Act of 1898 §§ 1-2, 33-43. The Act gave the referees jurisdiction, "subject always to a review by the judge," *id.* § 38, "to perform all duties conferred on 'courts of bankruptcy' as distinguished from those conferred on 'judges,' which were to be performed only by district judges." Countryman, *supra*, at 2-3; *see* Bankruptcy Act of 1898 §§ 1(20), 38.

The jurisdiction exercised by "courts of bankruptcy" (and, in turn, bankruptcy referees) under the 1898 scheme was customarily referred to as "summary jurisdiction." Countryman, *supra*, at 2-4. This "summary jurisdiction" covered three general areas: (1) handling administrative proceedings in the bankruptcy case, such as accepting the bankruptcy petition, allowing claims, granting discharges, and confirming debt adjustment plans, etc., Bankruptcy Act of 1898 §§ 2, 38; *see, e.g., U.S. Fidelity & Guaranty Co. v. Bray*, 225 U.S. 205, 218 (1912), (2) resolving controversies over property in the actual or constructive possession of the court, Bankruptcy Act of 1898 §§ 2, 38; *see, e.g., Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481 (1940), and (3) deciding, "by consent of the defendant," actions brought by the bankruptcy trustee that were "plenary in character" because the bankrupt could have brought them in another forum in the absence of the bankruptcy proceedings, Bankruptcy Act of 1898 § 23b; *MacDonald v. Plymouth County Trust Co.*, 286 U.S. 263, 266-67 (1932); *see also* Countryman, *supra*, at 2-3.[21]

Bankruptcy proceedings under the 1898 Act "were generally conducted before referees, except in those instances in which the district court elected to withdraw a case from a referee." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 53 (1982). The district court presided over any appeal from a referee's final order. *Id.*

In 1978, Congress passed the Bankruptcy Reform Act, which eliminated the referee system and established "in each judicial district, as an adjunct to the district court for such district, a bankruptcy court which shall be a court of record known as the United States Bankruptcy Court for the district." *Id.* (quoting 28 U.S.C. § 151(a) (Supp. IV 1981)). The 1978

---

[21]An example of a "plenary matter" that could be heard by consent of the parties was a "dispute[ ] involving property in the possession of a third person." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 53 (1982).

Act eliminated the distinction between "summary" bank-
ruptcy jurisdiction and "plenary" jurisdiction, and it "grant-
[ed] the new courts jurisdiction over all 'civil proceedings
arising under title 11 [the Bankruptcy title] or arising in or
related to cases under title 11.' " *Id.* at 54 (second alteration
in original) (emphasis omitted) (quoting 28 U.S.C. § 1471(b)
(Supp. IV 1981)); *see also* 28 U.S.C. § 1471(b) (Supp. IV
1981) (noting that the district courts' jurisdiction was "origi-
nal but not exclusive"). With limited exception, under the
1978 Act, the judges of the bankruptcy courts had "all of the
'powers of equity, law, and admiralty.' " *Id.* at 55 (quoting 28
U.S.C. § 1481 (Supp. IV 1981)).

The most important provision of the 1978 Act was
§ 1471(c), which provided that "[t]he bankruptcy court . . .
shall exercise all of the jurisdiction conferred by this section
on the district courts." 28 U.S.C. § 1471 (Supp. IV 1981).
Congress knew that this provision raised serious constitu-
tional concerns because it permitted an Article I tribunal to
exercise the same jurisdiction bestowed upon an Article III
court, but the risk of invalidation was deemed worth achiev-
ing the goal of setting up a faster and cheaper method to
accomplish reorganization. *See* Countryman, *supra*, at 7-9;
*see also* H.R. Rep. No. 95-595, at 5968 (1977) (acknowledg-
ing "serious constitutional doubts" raised by the full grant of
jurisdiction under the proposed bankruptcy system to non-
Article III judges).

The risk of invalidation was soon realized. In *Northern
Pipeline Construction Co. v. Marathon Pipe Line Co.*, the
Supreme Court considered whether the Constitution permitted
the bankruptcy court to exercise jurisdiction over a state law
breach of contract claim filed by the debtor in possession
against a third party who was a stranger to the bankruptcy
proceeding. 458 U.S. 50 (1982). The plurality explained that
the Bankruptcy Act of 1978 impermissibly shifted essential
attributes of judicial power from the Article III district court
to the non-Article III bankruptcy court. *Id.* at 87. The holding

of six justices in *Marathon* is fairly well summarized in a footnote to the plurality opinion:

> [A]t the least, the new bankruptcy judges cannot constitutionally be vested with jurisdiction to decide this state-law contract claim against Marathon. As part of a comprehensive restructuring of the bankruptcy laws, Congress has vested jurisdiction over this and all matters related to cases under Title 11 in a single non-Art. III court, and has done so pursuant to a single statutory grant of jurisdiction. In these circumstances we cannot conclude that if Congress were aware that the grant of jurisdiction could not constitutionally encompass this and similar claims, it would simply remove the jurisdiction of the bankruptcy court over these matters, leaving the jurisdictional provision and adjudicatory structure intact with respect to other types of claims, and thus subject to Art. III constitutional challenge on a claim-by-claim basis. Indeed, we note that one of the express purposes of the Act was to ensure adjudication of all claims in a single forum and to avoid the delay and expense of jurisdictional disputes. Nor can we assume, as THE CHIEF JUSTICE suggests that Congress' choice would be to have these cases "routed to the United States district court of which the bankruptcy court is an adjunct." We think that it is for Congress to determine the proper manner of restructuring the Bankruptcy Act of 1978 to conform to the requirements of Art. III in the way that will best effectuate the legislative purpose.

458 U.S. at 88 n.40 (Brennan, J., plurality) (joined by Justices Marshall, Blackmun, and Stevens) (citations omitted); *see also id.* at 91-92 (Rehnquist, J., concurring) (joined by Justice O'Connor). The Court stayed its judgment in *Marathon* for six months to allow Congress the opportunity to remedy the

IN RE MARSHALL

constitutional flaws in the 1978 Act's grant of jurisdiction to the bankruptcy courts. *Id.* at 88.

Congress did not act in time, and the Court's mandate took effect. Faced with the potential collapse of the bankruptcy system, the Judicial Conference "adopt[ed] a resolution requiring the Director of the Administrative Office of the United States Courts to 'provide each circuit with a proposed rule' which was to take effect [as a local rule] in the absence of congressional action." Countryman, *supra*, at 19; *see* Collier ¶ 3.01[2][b][ii] & n.16 (discussing the emergency rule and reproducing its text). The purpose of this resolution was "to permit the bankruptcy system to continue without disruption in reliance on jurisdictional grants remaining in the law as limited by" *Marathon. Countryman, supra*, at 19.

The Emergency Rule continued the bankruptcy system established by the 1978 Act with the exception of how "related proceedings" like the contract claim in *Marathon* would be treated. *See* Collier ¶ 3.01[2][b][ii] & n.16. The Emergency Rule defined "related proceedings" as "those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or state court."[22] Emergency Rule § d(3)(A), *reproduced at* Collier ¶ 3.01[2][b][ii] n.16. The Emergency Rule prohibited bankruptcy judges from entering a judgment or dispositive order on related proceed-

---

[22]The Emergency Rule went on to explain that:

> Related proceedings include, but are not limited to, claims brought by the estate against parties who have not filed claims against the estate. Related proceedings do not include: contested and uncontested matters concerning the administration of the estate; allowance of and objections to claims against the estate; counterclaims by the estate in whatever amount against persons filing claims against the estate . . . . A proceeding is not a related proceeding merely because the outcome will be affected by state law.

Emergency Rule § d(3)(A), *reproduced at* Collier ¶ 3.01[2][b][ii] n.16.

ings; instead, the bankruptcy court was to "submit findings, conclusions, and a proposed judgment or order to the district judge, unless the parties to the proceeding consent to entry of the judgment or order by the bankruptcy judge." Emergency Rule § d(3)(B), *reproduced at* Collier ¶ 3.01[2][b][ii] n.16.

More than two years after the *Marathon* decision, Congress finally passed the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub. L. No. 98-353 (HR 5174), 98 Stat. 333 (1984). The 1984 Act, with amendments not relevant to this proceeding, governs the dispute before us.

[1] Under the 1984 Act the district court continues to have original jurisdiction over all cases under title 11 and "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a)-(b). The district court, in turn, may refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy court. *Id.* § 157(a). Thus, as under the 1978 Act, the bankruptcy court's subject matter jurisdiction under the 1984 Act is coterminous with that of the district court. *See id.* §§ 157(a), 1334; *Fietz v. Great W. Sav. (In re Fietz)*, 852 F.2d 455, 457 (9th Cir. 1988).

The manner in which the bankruptcy court may exercise its delegated jurisdiction under the 1984 Act, however, differs greatly from its 1978 predecessor. In an obvious effort to comply with the principles of *Marathon*, gone is the problematic provision from the 1978 Act empowering the bankruptcy court to exercise "all of the jurisdiction" of the district court. 28 U.S.C. § 1471 (Supp. IV 1981). Instead, subsections (b) and (c) to § 157 prescribe the manner in which the bankruptcy court may exercise its delegated jurisdiction by identifying those situations (1) when the bankruptcy court is authorized to issue a final order disposing of some or all of the matters before it and (2) when the bankruptcy court is empowered only to make a report and recommendation to the district

court. 28 U.S.C. § 157(b)-(c); *see also* Countryman, *supra*, at 35 (noting that like the Emergency Rule, the 1984 Act distinguishes between "when the bankruptcy judge can act as a judge" and "when he acts only as a special master").

[2] Section 157(b)(1) provides that "Bankruptcy judges may hear and determine all cases under title 11 and all *core proceedings arising under* title 11, or *arising in* a case under title 11" that are referred to it by the district court.[23] 28 U.S.C.

---

[23]The term "core" has its roots in Justice Brennan's plurality in *Marathon*. 458 U.S. at 71 (referring to matters "at the core of federal bankruptcy power"). There, Justice Brennan concluded that the statutory grant of "causes of action owned by the debtor at the time of the petition for bankruptcy" could not be squared with the separation of powers doctrine, which requires that Article III federal judicial power be vested in Article III judges. *Id.* at 54, 62, 76, 84, 87. Justice Brennan went on to explore "three narrow" exceptions to the separation of powers doctrine that permitted the use of "legislative courts" because of the appellant's argument that the bankruptcy courts could have been so constituted. *Id.* at 63-64. One exception was for territorial courts in "certain geographical areas, in which no State operated as sovereign" such as the District of Columbia, Indian tribal courts, and consular courts. *Id.* at 64-65. The second exception was for the establishment of military courts-martial. *Id.* at 66. The third exception was for adjudications involving "public rights," which are those matters that "aris[e] between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments, and . . . that historically could have been determined exclusively by those departments." *Id.* at 67-68 (internal citations and quotations omitted).

In contrast, Justice Brennan explained that "the liability of one individual to another under the law as defined, is a matter of private rights. . . . Private-rights disputes . . . lie at the core of the historically recognized judicial power." *Id.* at 69-70. He further cautioned that "the restructuring of debtor-creditor relations, *which is at the core of the federal bankruptcy power*, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a 'public right,' but the latter obviously is not." *Id.* at 71 (emphasis added).

The Supreme Court has not explicitly held that the restructuring of debtor-creditor relations is a public right. *See Granfinanciera v. Nordberg*, 492 U.S. 33, 56 n.11 (1989) ("We do not suggest that the restructuring of debtor-creditor relations is in fact a public right. This thesis has met with substantial scholarly criticism . . . and we do not seek to defend it here.").

§ 157(b)(1) (emphasis added). In subsection (b)(2) Congress provided a non-exhaustive definition of core proceedings that includes the omnibus categories of "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of assets of the estate." *Id.* § 157(b)(2)(A), (O);[24]

---

[24]In full, subsection (b)(2) provides as follows:

Core proceedings include, but are not limited to—

   (A)   matters concerning the administration of the estate;

   (B)   allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

   (C)   counterclaims by the estate against persons filing claims against the estate;

   (D)   orders in respect to obtaining credit;

   (E)   orders to turn over property of the estate;

   (F)   proceedings to determine, avoid, or recover preferences;

   (G)   motions to terminate, annul, or modify the automatic stay;

   (H)   proceedings to determine, avoid, or recover fraudulent conveyances;

   (I)   determinations as to the dischargeability of particular debts;

   (J)   objections to discharges;

   (K)   determinations of the validity, extent, or priority of liens;

   (L)   confirmations of plans;

   (M)   orders approving the use or lease of property, including the use of cash collateral;

   (N)   orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

*Harris v. Wittman (In re Harris)*, 590 F.3d 730, 738 (9th Cir. 2009). Congress also indicated that a matter may be a core proceeding even if its outcome may be affected by state law. *See* 28 U.S.C. § 157(b)(3).

[3] By way of comparison, § 157(c)(1) authorizes the bankruptcy judge to "hear a proceeding that is *not a core proceeding but that is otherwise related to* a case under title 11." *Compare id.* § 157(c)(1) (emphasis added), *with id.* § 157(b)(1) (authorizing the bankruptcy court to "hear *and determine*" certain matters) (emphasis added). For proceedings falling within § 157(c)(1), the bankruptcy court is empowered only to "submit proposed findings of fact and conclusions of law to the district court." *Id.* § 157(c)(1). Thus, unless the parties consent to final determination by the bankruptcy judge, *id.* § 157(c)(2), the responsibility to "determine" a "[non-]core proceeding that is otherwise related to a case under title 11" always remains with the district court, *id.* § 157(c)(1) ("[A]ny final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.").

[4] The 1984 Act does not specifically detail what it means for a civil proceeding to "arise under title 11," "arise in a case under title 11," "or relate[ ] to a case under title 11." Our case law, however, holds that proceedings "arise under title 11" if they "involve a cause of action created or determined by a

---

(O)  other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

(P)  recognition of foreign proceedings and other matters under chapter 15 of title 11.

28 U.S.C. § 157(b)(2).

statutory provision of title 11." *In re Harris*, 590 F.3d at 737. On the other hand, civil proceedings "arise in a case under title 11" when they are "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *In re Eastport Assocs.*, 935 F.2d 1071, 1076-77 (9th Cir. 1991) (quoting *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987)); *see In re Harris*, 590 F.3d at 737.[25] Like the Fourth, Fifth, and Eight Circuit Courts of Appeal, we adopted without modification the Third Circuit's definition of what constitutes a "related" proceeding:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.... An action is related to bankruptcy if the outcome could alter the debtor's right, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

With this constitutional and statutory backdrop in mind, we turn to the question before us today: whether the bankruptcy judge could "hear and determine," as a "core proceeding[ ] arising under title 11, or arising in a case under title 11,"

---

[25]*See In re Goodman*, 991 F.2d 613, 616-17 (9th Cir. 1993) (discussing *In re Eastport Associates* and proceedings arising under title 11 or arising in a case under title 11); *see also* H.R. Rep. No. 95-595, at 6401 (Sept. 8, 1977) ("The phrase 'arising under' has a well defined and broad meaning in the jurisdictional context. By a grant of jurisdiction over all proceedings arising under title 11, the bankruptcy courts will be able to hear any matter under which a claim is made under a provision of title 11."); Collier ¶ 3.01[4][c][i] (statutory language suggests that civil proceedings arise under title 11 "when the cause of action is one that is created by title 11").

Vickie Lynn Marshall's counterclaim for tortious interference against Pierce Marshall.

### 2

Pierce Marshall takes the position that even if a counterclaim is asserted in response to a proof of claim against the bankruptcy estate, such that it meets Congress' definition of a core proceeding contained in § 157(b)(2)(C), the bankruptcy court cannot exercise "final order" jurisdiction over it under § 157(b)(1) unless the counterclaim "arises under" or "arises in a case under" the Bankruptcy Code. Pierce Marshall argues that Vickie Lynn Marshall's claim neither "arises under" nor "arises in a case under" the Bankruptcy Code: it is a state law counterclaim that could have been brought and was brought, at least in part, in a non-bankruptcy forum. Because there is nothing unique to bankruptcy about her claim, Pierce Marshall argues that the bankruptcy court could not, consistent with the Constitution, the *Marathon* decision, and the bankruptcy court's statutory grant of power in § 157(b)(1), enter a final judgment against him.

We agree with Pierce Marshall that our case law presents a two-step approach. A bankruptcy judge may only determine a claim that meets Congress' definition of a core proceeding *and* arises under or arises in title 11. *See In re Harris*, 590 F.3d at 737-41. We disagree, however, with Pierce Marshall's argument that the fact that Vickie Lynn Marshall's counterclaim could have been brought in state court and was not a bankruptcy-specific claim automatically renders the claim non-core. This approach goes too far and may render § 157(b)(2)(C) superfluous.[26] Under Pierce Marshall's narrow

---

[26]This concern was appropriately shared by the district court, which wrote:

> Thus, on one hand, calling any counterclaim that falls within the literal language of the statute core seems to contradict the holding

reading of the statute it is difficult to imagine a counterclaim against a person filing against the estate that "arises under" the Bankruptcy Code or "arises in a case under" the Bankruptcy Code and that is not already covered by a more specific provision of § 157(b)(2). Many creditor claims filed against a bankruptcy estate are based upon state law, not the Bankruptcy Code or something else that is unique to the bankruptcy context.[27] We do not believe that Congress intended § 157(b)(2)(C) to be a meaningless (or near meaningless) provision, which is what it would become under Pierce Marshall's overly restrictive approach. *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370-71 (1988) (construing several sections of the Bankruptcy Code and observing that "[s]tatutory construction . . . is a holistic endeavor"); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 467-77 (2003) (cautioning against construing a "statute in a manner that is strained and, at the same time, would render a statutory term superfluous").

*Harris* may seem to provide some validity to Pierce Marshall's argument because that decision relied on the fact that the contract claim "arose from the administration of [the] bankruptcy estate." *In re Harris*, 590 F.3d at 740. However, in *Harris* we required a bankruptcy nexus only because there we dealt with § 157(b)(2)(A), one of the "catchall" provi-

---

of *Marathon*. On the other hand, calling any counterclaim that could have been asserted as an independent lawsuit seems to render § 157(b)(2)(C) itself nugatory, because any counterclaim could have been asserted as a separate lawsuit absent the filing of the bankruptcy petition. *Collier* notes this problem and states that "[t]he matter is still unsettled."

*In re Marshall*, 264 B.R. at 630.

[27]Indeed, Congress' awareness of this fact is reflected in its expressed desire that a determination of whether something is a "core proceeding under this subsection [§157(b)] or is a proceeding that is otherwise related to a case under title 11 [§ 157(c)] . . . not be made solely on the basis that its resolution may be affected by State law." *See* 28 U.S.C. § 157(b)(3).

sions. *See id.* at 739-41. Section 157(b)(2)(A) refers to "matters concerning the administration of the [bankruptcy] estate." *Harris* relied on earlier precedent to determine that if the only applicable provision in § 157(b)(2) is one of the catchall provisions, the claim must literally fit within the wording of the catchall provision to be considered core. *See Harris*, 590 F.3d at 740. Here, we do not deal with the catchall provisions of § 157(b)(2) but with one of the specific provisions, § 157(b)(2)(C). Thus, although Vickie Lynn Marshall's counterclaim for tortious interference could have been brought independently from the bankruptcy proceeding and was not unique to the bankruptcy context, we have not reached the end of our inquiry.

While Pierce Marshall's approach is too narrow, Vickie Lynn Marshall's is too expansive. She takes the position that her counterclaim falls within the plain language definition of a "core proceeding" as a "counterclaim[ ] by the estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C). As far as Vickie Lynn Marshall is concerned, that should end the matter because the " 'core proceedings' listed in § 157(b), by definition, meet the arising in/arising under standard." Vickie Lynn Marshall Supplemental Br. at 6. Her criticism of Pierce Marshall's two step approach finds some support in the fact that few courts consider separately the questions whether something is a "core proceeding" and whether it "arises under" the Bankruptcy Code or "arises in a case under" the Bankruptcy Code. *But see In re Harris*, 590 F.3d at 737-41.

Even so, Vickie Lynn Marshall's reading of § 157(b)(2)(C) sweeps too broadly and would permit the bankruptcy court to consider under § 157(b)(2)(C) counterclaims that are factually and legally unrelated to the claim being asserted against the bankruptcy estate. Such an expansive reading of § 157(b)(2)(C) would certainly run afoul of the Court's holding in *Marathon*.[28] It would also arguably be inconsistent with

---

[28]Indeed, most courts to have considered the issue have agreed that a limiting construction of § 157(b)(2)(C) is necessary to make it conform to

---

IN RE MARSHALL                    4521

the Congress' intent to revise the Bankruptcy Code in a manner consistent with the principles of *Marathon* to make its jurisdictional grant constitutional.

Recognizing this shortcoming in her argument, and taking heed of our warning that the term "core proceeding" must be construed narrowly "to avoid potential constitutional problems arising from having Article I judges issue final orders in cases requiring an Article III judge," *Dunmore*, 358 F.3d at 1115, Vickie Lynn Marshall argues that her claim is a core proceeding arising in a case under the Bankruptcy Code because it is a *compulsory* counterclaim to the defamation claim asserted in Pierce Marshall's proof of claim and underlying his nondischargeability complaint. Vickie Lynn Marshall argues that the adjudication of a compulsory counterclaim effectively becomes part of the claims allowance process, something that is unique and core to bankruptcy proceedings. She further argues that Pierce Marshall consented to the bankruptcy court's entering a final order on the counterclaim because it is a compulsory counterclaim to the proof of claim that Pierce Marshall chose to file with the bankruptcy court knowing that the proof of claim would be finally determined as a "core proceeding[ ] arising under title 11, or arising in a case under title 11." In support of these related arguments, she relies primarily on the Supreme Court case of *Katchen v. Landy*, 382 U.S. 323 (1966), and other cases that have discussed and reaffirmed *Katchen* after the passage of the 1984 Bankruptcy Amendments and Federal Judgeship Act. *See, e.g., Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990); *Granfinanciera v. Nordberg*, 492 U.S. 33, 57-60 (1989).

**[5]** We agree with Vickie Lynn Marshall that her claim is

---

the *Marathon* opinion. *See* Collier ¶ 3.02[3][d][i] (discussing the approaches that courts have taken to limit the broad sweep of § 157(b)(2)(C)).

a compulsory counterclaim because the "operative facts underlying [her] action" are the same as those underlying the defamation claim. *See Pochiro v. Prudential Ins. Co.*, 827 F.3d 1246, 1250-51 (9th Cir. 1987) (applying Arizona law but relying on federal law in its analysis); *see* Fed. R. Civ. P. 13(a)(1) (defining a compulsory counterclaim as one held by the pleader at the time of service that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and "does not require adding another party over whom the court cannot acquire jurisdiction"). The defamation claim, Vickie Lynn Marshall's affirmative defense of truth, and her counterclaim for tortious interference all concern the alleged efforts by Pierce Marshall to obtain control of his father's estate by inundating his father with estate planning paperwork and forging or otherwise improperly obtaining his father's signature on the document that made the Living Trust irrevocable.[29] Thus, under our "logical relationship" test, Vickie Lynn Marshall's claim qualifies as a compulsory counterclaim. *See Pochiro*, 827 F.3d at 1249-51.

We also agree with Vickie Lynn Marshall's second proposition-that a compulsory counterclaim, even one based entirely on state law, can be a "core proceeding[ ] . . . arising in a case under title 11." *Cf. In re Harris*, 590 F.3d at 738-41 (holding that a state law contract claim was a "core proceeding" that "arose under" title 11). We disagree, however, with

---

[29]Our review of the record reflects that Vickie Lynn Marshall had not joined the will contest until 1998, well after she had asserted the counterclaim in the bankruptcy proceeding. Thus the exception to compulsory counterclaims for those claims pending elsewhere, *see* Fed. R. Civ. P. 13(a)(2)(A), does not apply to the bankruptcy counterclaim. Furthermore, even if the claim had been pending in Texas, if the "defendant [here, Vickie Lynn Marshall] elects to interpose the pending claim as a counterclaim, . . . [s]he should be allowed to do so, and the counterclaim will be treated as if it were compulsory and thus under the ancillary jurisdiction of the court." 6 Wright & Miller, Federal Practice and Procedure § 1411 (citing, *inter alia, Union Paving Co. v. Downer Corp.*, 276 F.2d 468, 470 (9th Cir. 1960)).

her suggestion that *all* compulsory counterclaims must be "core proceedings . . . arising in a case under title 11." Instead, a closer consideration of the Supreme Court case upon which Vickie Lynn Marshall relies, *Katchen*, leads to the conclusion that some, but not all, compulsory counterclaims fall within the scope of § 157(b)(1) & (2)(C). Critical to the Court's decision that the bankruptcy court had jurisdiction over the trustee's counterclaim in *Katchen* was the fact that the bankruptcy court was unable to perform its statutory duty of allowing or disallowing the creditor's claim unless it ruled upon the trustee's counterclaim. *See* 382 U.S. at 329-30. According to the Court, ruling on the preference issue was "part and parcel of the allowance process," *id.* at 330, and "once the bankruptcy court has dealt with the preference issue nothing remains for adjudication in a plenary suit," *id.* at 334. Thus, the bankruptcy trustee's counterclaim had to be determined in order to rule upon the claims originally brought by the creditor against the estate. *See id.* at 330 (stating that the "bankruptcy court *must necessarily determine*" the voidable preference issue to resolve the creditor's claim against the estate) (emphasis added). That the Court also reasoned that a claimant "consents" to the court's jurisdiction of those matters which must be determined in order to resolve his claim, even if presented by way of a counterclaim, is an unsurprising conclusion.

There is no logical inconsistency to our holding that Vickie Lynn Marshall's counterclaim is compulsory but not "core." The test for compulsory counterclaims is generous and designed to promote judicial efficiency by avoiding multiplicity of lawsuits. *See Albright v. Gates*, 362 F.2d 928, 929 (9th Cir. 1966). On the other hand, the standard delineating what is a core proceeding is much narrower because it is designed to comply with the constitutional limitations on the bankruptcy court's jurisdiction as set forth in *Marathon*.

[6] Our review of the evolution of the Bankruptcy Code, the Supreme Court's opinions in *Katchen* and *Marathon*, as

well as our own jurisprudence cautioning against creating constitutional problems through an overly broad construction of what is a "core proceeding," *Piombo Corp. v. Castlerock Props. (In re Castlerock Props.)*, 781 F.2d 159, 162 (9th Cir. 1986), leads us to agree with the amici curie professors that "a counterclaim under § 157(b)(2)(C) is properly a 'core' proceeding 'arising in a case under' the [Bankruptcy] Code only if the counterclaim is so closely related to the proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself." Professors' Amicus Br. at 11. Such a construction of § 157(b)(2)(C) takes into account the whole of the statute, avoids rendering any terms superfluous, follows *Katchen*, and comports with the principles of *Marathon* and Congress' desire to revise the Bankruptcy Code in a manner consistent with the Constitution.

3

Vickie Lynn Marshall's compulsory counterclaim is not a core proceeding arising in a case under the Bankruptcy Code because it is not so closely related to Pierce Marshall's defamation claim that it must be resolved in order to determine the allowance or disallowance of his claim against her bankruptcy estate.

The district court correctly noted that "the nexus between the transactions out of which the claim and counterclaim arise . . . is somewhat attenuated," but its analysis went astray when it used a retrospective approach to support this factual finding. *In re Marshall*, 264 B.R. at 631 (stating that Pierce Marshall had obtained a judgment against Vickie Lynn Marshall's attorneys *"prior to the time* when his claim against Vickie was *ruled on by the bankruptcy court,"* making the main issue presented by Pierce Marshall's claim Vickie Lynn Marshall's responsibility for her attorneys' actions) (emphasis added).

**[7]** In bankruptcy cases, jurisdiction over a claim and the compulsory status of a counterclaim is determined as of the time the claim is pleaded. *In re Fietz*, 852 F.2d at 457 n.2. Accordingly, the analysis of whether a compulsory counter-claim such as Vickie Lynn Marshall's should be afforded "core treatment" must focus largely on what is available to the court at the time of filing, that is, the parties' pleadings.[30] A review of Pierce Marshall's proof of claim and attached non-dischargeability complaint and Vickie Lynn Marshall's answer, objections, and tortious interference counterclaim leads to the inescapable conclusion that the resolution of Vickie Lynn Marshall's counterclaim was not a necessary predicate to the bankruptcy court's decision to allow or disal-low Pierce Marshall's defamation claim.

**[8]** The differences between the nature and scope of the factual allegations contained in Pierce Marshall's claim and Vickie Lynn Marshall's counterclaim support our conclusion that her counterclaim was not an integral part of the claims allowance and disallowance process. Pierce Marshall's defa-mation claim focused upon the alleged "tortious smear cam-paign" that Vickie Lynn Marshall and her attorneys devised "to obtain a quick recovery from the estate of J. Howard Mar-shall II." The statement at issue by one of the attorneys was that the attorney was:

> "bothered" by "the blizzard of documents that were put in front of Howard Marshall to sign two weeks after his marriage to Anna Nicole Smith [Vickie Lynn Marshall]. . . . He signed all of them in almost

---

[30]We say that the focus is largely on the pleadings because there may be other information available to the bankruptcy court, for example, by way of a motion under § 157(b)(3) or oral argument on the motion, that would not be retrospective in nature. *See* 28 U.S.C. § 157(b)(3) (providing that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11").

completely illegible fashion which makes sense
because he couldn't read at the time, according to his
doctors. . . . J. Howard Marshall's signature appears
as sort of a squiggle with only the 'J' clearly read-
able. . . . The documents, signed about two weeks
after the oilman's June 27, 1994 marriage, gave the
son full control over the J. Howard Marshall, II liv-
ing trust. . . . The effect of it was basically an attempt
to remove J. Howard Marshall from control of his
estate."

Another statement by an attorney upon which Pierce Marshall
based his claim was that "the law clearly entitles Smith
[Vickie Lynn Marshall] to half of what her late husband
earned during their marriage" and that there was some con-
cern "about the documents [J. Howard] Marshall *purportedly*
signed two weeks after his marriage." Pierce Marshall also
found objectionable Vickie Lynn Marshall and her attorneys'
efforts to tarnish his reputation by characterizing him as
"greedy and miserly" and "a real control freak." Thus, Pierce
Marshall's defamation claim and any defense of truth to such
a claim would largely focus on whether J. Howard Marshall II
had the capacity to sign the estate planning documents Pierce
Marshall presented to him after J. Howard Marshall II's mar-
riage to Vickie Lynn Marshall and whether he did, in fact,
knowingly and validly execute the documents. By way of
comparison, the allegations upon which Vickie Lynn Marshall
bases her tortious interference counterclaim are far less
focused—they span a number of years, encompass various
incidents of purported tortious conduct, and cover a broad
array of financial and estate planning transactions beyond
those which would be determinative of Pierce Marshall's def-
amation claim.[31] In addition to the differences in proof

---

[31]For example, in her counterclaim Vickie Lynn Marshall made the fol-
lowing allegation:

> Debtor is informed and believes that Counterdefendant intention-
> ally interfered with that expectancy by engaging in a concerted

between the two claims, there is little overlap of the legal elements of the claims at issue. Pierce Marshall's defamation claim could be fully adjudicated without fully adjudicating Vickie Lynn Marshall's tortious interference claim. Even if it were shown that the statements made by Vickie Lynn Marshall's attorneys were true (with the reasonable inference drawn from those statements being that Pierce Marshall used forgery or fraud to gain control of the Living Trust and make it irrevocable), in order to prevail on her claim, Vickie Lynn Marshall would still be obligated to establish, *inter alia*, that J. Howard Marshall II intended to make her an inter vivos gift, that it was reasonably certain that J. Howard Marshall II would have made the gift but for Pierce Marshall's inference, and the amount of damages that Pierce Marshall caused through his tortious conduct. Nothing in Pierce Marshall's defamation claim puts these factual and legal questions at issue.

In conclusion, although a compulsory counterclaim based on a state law cause of action can, under certain circumstances, be a core proceeding arising in a case under the Bankruptcy Code and be within the constitutional and statutory delegation of authority to bankruptcy judges to enter final orders, this is not such a case.

---

campaign to undermine Mrs. Marshall's rights and Mrs. Marshall's marriage to her Husband, by effectively imprisoning Mr. Marshall against his wishes, by surrounding Mr. Marshall with hired agents who reported to the Younger Son, by stationing armed guards to prevent access and personal contact between Husband and Wife, by cutting off support and obstructing the expressed wishes of Mr. Marshall, by deceiving Mr. Marshall, by attempting to undo gifts made by Mr. Marshall, by preparing documents and by ostensibly making transfers of property of Mr. Marshall which were inconsistent with his expressed wishes and desires, by making misrepresentations against Mrs. Marshall, by cutting off income to Mr. and Mrs. Marshall, by suborning false testimony against Mrs. Marshall, by abusing legal process, and by other actions that shall be proven at trial.

IN RE MARSHALL

## B

**[9]** Our conclusion that Vickie Lynn Marshall's counterclaim for tortious interference was not a "core proceeding[ ] . . . arising in a case under title 11" means that the Texas probate court issued the earliest final judgment on certain matters relevant to this proceeding. Pierce Marshall argues that the district court erred when it refused to give any preclusive effect to the Texas probate court's judgment.[32] Having already noted in our previous opinion that "[o]ur review of the trial records in the Texas probate court and in the United States district court discloses conflicting findings of fact critical to the merits of the cases of the contesting parties," *In re Marshall*, 392 F.3d at 1123, it is perhaps unsurprising that we agree with Pierce Marshall that the doctrine of issue preclusion applies and that it prevents Vickie Lynn Marshall's success on her claim for tortious interference.

---

[32]The district court denied Pierce Marshall's motion for summary judgment on the basis of res judicata and collateral estoppel. The district court reasoned that res judicata (claim preclusion) did not apply because Vickie Lynn Marshall did not actually litigate in Texas her claim against Pierce Marshall for tortious interference with an inter vivos gift. Nor did the district court believe that Vickie Lynn Marshall was obligated to bring the claim as a compulsory counterclaim because it was pending before the bankruptcy court when she joined the will contest in Texas. *See* Tex. R. Civ. P. 97 (excluding from the definition of compulsory counterclaim those claims that are "the subject of a pending action").

With respect to collateral estoppel (issue preclusion), the district court did not consider the Texas probate court's judgment to be final because the Texas probate court had plenary jurisdiction to change its judgment for a certain amount of time following its entry. The district court further denied the motion as untimely and inconsistent with the notion of fundamental fairness. Noting the motion was filed more than two years after the bankruptcy court's trial and after Vickie Lynn Marshall had nonsuited her affirmative claims in the Texas probate court, the district court also found that the identity of issues required for issue preclusion was lacking, explaining that "while it might be the province of the Texas probate court to determine what J. Howard intended to do with his estate when he died, the question before this Court is what he intended to do with it while he was still alive."

1

**[10]** Through the Full Faith and Credit Act, 28 U.S.C. § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgment emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96 (1980). Under the doctrine of collateral estoppel, often called issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen*, 449 U.S. at 94; *see also Robbins v. HNG Oil Co.*, 878 S.W.2d 351, 361 (Tex. App. 1994). To establish collateral estoppel under Texas law, a party must demonstrate: "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994). If these requirements are met, issue preclusion applies even when the subsequent litigation rests on a new theory of recovery. *Wilhite v. Adams*, 640 S.W.2d 875, 876 (Tex. 1982).

Under Texas law, an issue has been "fully and fairly litigated" if the particular fact or issue was the same in the two proceedings and was "actually litigated" in the prior proceeding. *See Nat'l Union Fire Ins. Co. v. Dominguez*, 793 S.W.2d 66, 71 (Tex. App. 1990), *rev'd on other grounds*, 873 S.W.2d 633, 637 (Tex. 1994). To determine if a matter was "actually litigated," Texas courts consider the following factors: "whether the parties were fully heard; whether the court supported its decision with reasoned opinion; and whether the decision was subject to appeal or was in fact reviewed on appeal." *Cole v. G.O. Assocs., Ltd.*, 847 S.W.2d 429, 431 (Tex. App. 1993).

2

The first step of our issue preclusion analysis is satisfied because several of the legal and factual issues that Vickie Lynn Marshall sought to litigate in the bankruptcy proceeding had already been litigated and finally determined in the Texas probate action.

[11] Under Texas law, a claim for tortious interference with an inter vivos gift arises when a person "by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that [s]he would otherwise have received." Restatement Second of Torts § 774B; *see Marshall*, 547 U.S. at 311; *see also King v. Acker*, 725 S.W.2d 750, 754 (Tex. App. 1987) (discussing tortious interference with inheritance rights and citing the Restatement formulation of the tort); *Brandes v. Rice Trust, Inc.*, 966 S.W.2d. 144, 146-47 (Tex. App. 1998) (same). Such a person will be "subject to liability to the other for loss of the inheritance or gift." Restatement Second of Torts § 774B. As explained by the district court, the Texas courts have not clearly delineated the elements of a cause of action for tortious interference, but those jurisdictions which have generally agree that a plaintiff must prove (1) the existence of an expectancy, (2) a reasonable certainty that the expectancy would have been realized but for the interference, (3) intentional interference with that expectancy, (4) tortious conduct involved with the interference, and (5) damages. *In re Marshall*, 275 B.R. at 51 (citing *Dougherty v. Morris*, 871 P.2d 380 (N.M. 1994)). Vickie Lynn Marshall's ability to establish a number of these elements is compromised by the Texas probate court's factual findings.

[12] Most importantly, to prevail on her claim against Pierce Marshall, Vickie Lynn Marshall must prove that J. Howard Marshall II would have given her a substantial inter vivos gift but for Pierce Marshall's interference. This is contrary to the Texas probate court's finding that J. Howard

Marshall II "did not intend to give and did not give to [Vickie Lynn Marshall] a gift or bequest from the Estate of [J. Howard Marshall II] or from the [Living Trust] either prior to or upon his death."

Vickie Lynn Marshall also has the burden of demonstrating that any interference by Pierce Marshall was tortious or, in the words of the Restatement, that he used "fraud, duress or other tortious means" to prevent J. Howard Marshall II from giving Vickie Lynn Marshall the intended gift. To do so, Vickie Lynn Marshall primarily relied on Pierce Marshall's purported manipulation of his father's assets and his father's estate planning documents. The Texas probate court found, however, that the various estate planning documents executed by J. Howard Marshall were valid and reflected his desires. Specifically, the Texas probate court found that (1) J. Howard Marshall II's will and the 1982 Living Trust were valid, (2) J. Howard Marshall II had not been the victim of fraud or undue influence, and (3) J. Howard Marshall II possessed the requisite mental capacity when he executed the Living Trust, as amended, and his last will and testament. Also central to Vickie Lynn Marshall's ability to demonstrate a reasonable expectancy and ascertainable damages is the invalidation of the Living Trust. Vickie Lynn Marshall estimated that the value of her expected gift exceeded $300 million in her counterclaim; however, essentially all of J. Howard Marshall II's assets were held in the Living Trust after its creation in 1982. Shortly after his wedding to Vickie Lynn Marshall, J. Howard Marshall II modified his Living Trust to make it irrevocable. This modification, if valid, would prevent Vickie Lynn Marshall from ever being a beneficiary under the terms of the Living Trust, which is problematic to her claim of tortious interference because the very assets Vickie Lynn Marshall claimed that J. Howard Marshall II intended to give her were in the Living Trust. The Texas probate court upheld the validity of the Living Trust, as amended, and found that it reflected J. Howard Marshall II's intended disposition of his property.

These issues were fully and fairly litigated by Vickie Lynn Marshall and Pierce Marshall in the Texas probate court. Vickie Lynn Marshall was a party to the Texas probate proceeding during all relevant times and was afforded ample opportunity to present her affirmative case (until she non-suited her claims) and to defend against Pierce Marshall's counterclaim for a declaratory judgment. During the five-month trial in Texas, the jury and judge considered the evidence and arguments advanced by the parties, and the Texas probate court issued a reasoned opinion based upon the findings of fact as made by the unanimous jury.

The next step in our issue preclusion analysis is to consider whether the factual findings discussed above were essential to the Texas probate court's administration and final resolution of matters pertaining to J. Howard Marshall II's estate. Vickie Lynn Marshall argues that because she voluntarily nonsuited her claims in the Texas probate proceeding, the issues underlying her claims were not necessary to the Texas probate court's judgment. Although she opted not to pursue her claims for affirmative relief, Vickie Lynn Marshall remained in the probate proceeding as a defendant to Pierce Marshall's counterclaim. Pierce Marshall petitioned the probate court for a declaration that J. Howard Marshall II's Living Trust and will reflected his true intentions and were valid. He further sought declaratory relief to determine Vickie Lynn Marshall's rights as to the estate and property of J. Howard Marshall II. Thus, Vickie Lynn Marshall was at all relevant times a party adverse to Pierce Marshall in the Texas probate court.

To decide Pierce Marshall's counterclaims for a declaratory judgment, the Texas probate court was obligated to discern J. Howard Marshall II's true intentions regarding the property held by the Living Trust. To do so, the court had to resolve allegations that J. Howard Marshall II's estate plan and the transactions underlying it were tainted by illegality and that, contrary to his estate plan, J. Howard Marshall II intended to give Vickie Lynn Marshall a substantial inter vivos gift. Thus,

the Texas jury was tasked with responding to specific queries, many of which were on issues critical both to the resolution of Pierce Marshall's declaratory judgment request and to Vickie Lynn Marshall's success on her claim against Pierce Marshall for tortious interference with an expected inter vivos gift. The jury unanimously made the following factual findings: (1) the Living Trust and will were valid and had not been forged or altered, (2) J. Howard Marshall II had not been the victim of fraud or undue influence, (3) he had the requisite mental capacity when he executed his Living Trust and will, and (4) he did not have an agreement with Vickie Lynn Marshall that he would give her one-half of all his property.

The Texas probate court entered a final judgment in accordance with the jury's verdict and concluded that Pierce Marshall was entitled to his distribution as set forth in the Living Trust, as amended, and as provided in the last will and testament of J. Howard Marshall II.

The district court refused to give preclusive effect to any of the jury findings incorporated into the Texas probate court's judgment or to any of the Texas probate court's other factual findings or legal conclusions. Instead, the district court arrived at opposite findings on the same legal and factual questions.[33] In its 2002 judgment, the district court found that: J. Howard Marshall II intended to give Vickie Lynn Marshall a substantial gift that was to be in the form of a trust for her benefit; Pierce Marshall tortiously interfered with J. Howard Marshall II's intentions by engaging in illegitimate estate planning transactions; Pierce Marshall had altered the Living Trust to make it irrevocable in furtherance of his plan; and the Living Trust was invalid.

---

[33]Notably, the district court made its factual findings without the benefit of the percipient witnesses that Pierce Marshall sought to have testify as part of his defense. The Texas probate court, however, held a five-month jury trial during which it took live testimony from the witnesses of all parties involved.

**[13]** The district court was not free to reach these contradictory findings of fact; instead, it was bound to afford preclusive effect to the relevant factual findings made by the Texas probate court. It was similarly bound to afford preclusive effect to the overlapping legal issues finally determined by the Texas probate court as a necessary step to the Texas probate court's determination of the validity of J. Howard Marshall II's estate planning measures.

**[14]** The final step in our issue preclusion analysis is to inquire whether the parties were cast as adversaries in the first action. There can be no doubt that this step is satisfied.[34] Before she nonsuited her claims, Vickie Lynn Marshall named Pierce Marshall as a defendant to many of her claims. After she nonsuited her claims, Pierce Marshall amended his claims to include a request that the district court enter a declaratory judgment with respect to Vickie Lynn Marshall's interest (or lack thereof) in the estate of J. Howard Marshall II and the Living Trust.

**[15]** All of the elements of issue preclusion have been met in this case. The district court erred when it did not afford preclusive effect to the relevant determinations by the Texas probate court. Had it done so, it would have concluded that various legal and factual issues necessary to establish Vickie Lynn Marshall's tortious interference claim had already been decided against her by the Texas probate court, such that Pierce Marshall was entitled to judgment as a matter of law.

## IV

In conclusion, Vickie Lynn Marshall's counterclaim against Pierce Marshall for tortious interference with an inter vivos gift is not a "core proceeding[ ] arising under title 11,

---

[34]It makes no difference to our issue preclusion analysis that in Texas, Pierce Marshall was named in his representative capacity, but in California, he was named in the counterclaim in his personal capacity.

or arising in a case under title 11" for which the bankruptcy court is empowered to enter a final judgment. *See* 28 U.S.C. § 157(c). Because the Texas probate court's judgment was the earliest final judgment entered on matters relevant to this proceeding, the district court erred when it did not afford preclusive effect to the Texas probate court's determination of relevant legal and factual issues. Several of these determinations prevent Vickie Lynn Marshall from prevailing on her tortious interference claim in this proceeding. Because of our disposition of these two issues, we need not reach, and do not reach, the many other issues raised by Pierce Marshall and Vickie Lynn Marshall.

Neither party shall recover costs on the appellate proceedings subsequent to the Supreme Court's remand.

**REVERSED AND REMANDED.**

In re Marshall                    4537

**Volume 2 of 2**

KLEINFELD, Circuit Judge, concurring:

I concur in the result reached by Judge Beezer's opinion. Vickie's counterclaim against Pierce is not a core proceeding, so the Texas probate court judgment preceded the district court judgment and controls.

I have no quarrel with the majority opinion, and offer no argument against it. I write merely to offer additional grounds that compel the same result.

Several alternative and independent grounds compel reversal: (1) because Pierce Marshall sought no damages from the bankruptcy estate, just a judgment that his Texas defamation judgment would not be discharged by the California bankruptcy, his claim could not affect the size of the estate available to Vickie Marshall's creditors; (2) Vickie's counterclaim for money could not affect whether Pierce's defamation claim was dischargeable; (3) Vickie's counterclaim was not related to the bankruptcy, because she had already been discharged and her creditors would get none of the money she sought from Pierce in her counterclaim; (4) Pierce's defamation claim in Texas was a common law claim for personal injury, which cannot be core. Vickie's counterclaim (itself a non-core tort claim) amounted to evasion of Pierce's constitutional right to jury trial in Texas. That evasion cannot stand shielded by bankruptcy court jurisdiction, especially when her bankruptcy was over and her debts discharged.

Pierce's proof of claim is attached to this concurrence as an appendix. He made two substantive entries on the form. For the date the debt was incurred he said "see attached Ex. 'A'." And he checked the box for "unsecured nonpriority claim, and wrote "unliquidated" and "see attached Exhibit 'A' " rather than stating an amount. To understand what claim he made, we must therefore look at his exhibit A, which is attached.

Pierce's exhibit A is not a defamation claim for money. He had filed that in Texas years before, and was awaiting final

54

judgment. Instead, exhibit A is entitled "complaint to determine dischargeability of debt pursuant to 11 U.S.C. § 523(a)(6)." Pierce alleges that Vickie and her lawyers defamed him in the press, in order to humiliate him and to extort a settlement from him of the claims against his father's estate. Their "willful and malicious acts," he alleges, "resulted in injury to the Plaintiff and/or the Plaintiff's property." But he does not seek money damages for this defamation. He was doing that in Texas. For his "cause of action" in bankruptcy court, Pierce pleads that "any discharge" Vickie may receive under bankruptcy law "will not discharge E. Pierce Marshall's claims against the Defendant." His prayer does not seek money damages, just a declaratory judgement "that the Plaintiff's claims against the defendant have not been discharged" and costs, attorneys fees, and such other relief as is just.

Vickie's counterclaim cannot be core because Pierce carefully framed his complaint to seek only a declaratory judgment of nondischargeability, not a judgment that his defamation claim was meritorious and not a claim for money damages caused by the defamation. Bankruptcy court is the right place to litigate whether a debt was dischargeable. Pierce could not very well obtain judgment in a Texas trial court controlling dischargeability of a debt in a California bankruptcy. Bankruptcy court is the wrong place to litigate a common law claim for personal injury to final judgment, and Pierce did not seek to litigate his personal injury claim there.

The statute provides that "core" proceedings include "claims against the estate . . . but not the liquidation or estimation of contingent or unliquidated personal injury tort . . . claims against the estate for purposes of distribution in a case under chapter 11."[1] Thus "claim" for purposes of determining "core" is a statutory term of art meaning something narrower than what the word ordinarily means. Pierce's defamation claim would not be a "claim" under the statutory definition,

---

[1] 28 U.S.C. § 157(b)(2)(B); *see also id.* § 157 (b)(2)(O).

because the statutory definition excludes unliquidated personal injury claims. Neither his defamation claim being litigated in Texas nor his nondischargeability claim filed in bankruptcy court would affect distribution of the estate. One might imagine, from the statutory language alone, that because Pierce's claim for a declaratory judgment of nondischargeability is core, that any counterclaim would be core.[2] But the cases construing the statute establish that such an interpretation would be mistaken.[3] Compulsory claims, such as setoff, can be core, but not all counterclaims are core.[4] Vickie's tort claim for interference with an expected gift, though a counterclaim to Pierce's claim for a declaratory judgment of nondischargeability of his defamation claim, is not core.[5] Were core jurisdiction over counterclaims read

---

[2] *See id.* § 157(b)(2)(C) ("Core proceedings include, but are not limited to . . . counterclaims by the estate against persons filing claims against the estate").

[3] *See, e.g., Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159, 162 (9th Cir. 1986) ("The apparent broad reading that can be given to § 157(b)(2) should be tempered by the *Marathon* decision.").

[4] *See, e.g., Dunmore v. United States*, 358 F.3d 1107, 1114 (9th Cir. 2004) (holding that non-core matters are those that "do not depend on the Bankruptcy Code for their existence and . . . could proceed in another forum"); *Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997) ("Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered 'non-core.' "); *United States v. Yochum (In re Yochum)*, 89 F.3d 661, 670 (9th Cir. 1996) ("In determining whether a matter is a non-core proceeding, we look to a variety of factors 'such as whether the rights involved exist independent of title 11, depend on state law for their resolution, existed prior to the filing of a bankruptcy petition, or were significantly affected by the filing of the bankruptcy case.' ") (citation omitted).

[5] *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but . . . it is an 'otherwise related' or non-core proceeding.") (cited with approval by *Eastport Assocs. v. City of Los Angeles (In re Eastport Assocs.)*, 935 F.2d 1071, 1077 (9th Cir. 1991)).

more broadly, *Marathon* would loom as a constitutional barrier.[6] The bankruptcy court had jurisdiction to make a determination of whether Pierce's claims against Vickie would survive bankruptcy because the question of whether a claim is dischargeable in bankruptcy involves "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power."[7] That determination, however, does not require adjudication of liability or damages on Pierce's or Vickie's tort claims, and that determination is all Pierce sought in bankruptcy court.[8]

We held, applying *Marathon* and the 1984 Act implementing *Marathon*, in *Piombo Corp. v. Castlerock Properties (In re Castlerock Properties )*[9] that even though the debtor had filed a counterclaim to the creditors's claim, the counterclaim did not fall within the Bankruptcy Court's core jurisdiction. The creditor had not filed a claim for money in bankruptcy court, just for relief from the automatic stay, just as Pierce did not file a claim for money, merely for a nondischargeability determination. "In reaching this conclusion, we emphasized that courts 'should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems.' "[10] That, on

---

[6]*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982) (plurality opinion) ("Art. III bars Congress from establishing legislative courts to exercise jurisdiction over all matters related to those arising under the bankruptcy laws. The establishment of such courts does not fall within any of the historically recognized situations in which the general principle of independent adjudication commanded by Art. III does not apply.").

[7]*Id.* at 72.

[8]*See Eastport Assocs.*, 935 F.2d at 1077 ("While the district courts have jurisdiction under 28 U.S.C. § 1334 to decide state claims if they are related to a bankruptcy case, the bankruptcy courts may only decide claims if they are part of core proceedings. In noncore proceedings, the bankruptcy courts may only make recommendations to the district courts. 28 U.S.C. § 157(c)(1).").

[9]781 F.2d 159, 161 (9th Cir. 1986).

[10]*Taxel v. Elec. Sports Research (In re Cinematronics, Inc.)*, 916 F.2d 1444, 1450 (9th Cir. 1990) (quoting *Castlerock*, 781 F.2d at 160).

its face, Vickie's counterclaim appears to fall within the words of § 157(b)(2)(C), does not, under *Castlerock* and *Marathon*, end the matter. The Supreme Court, in *Marathon*, held that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law."[11] The same reasoning applies to Pierce's tort claim arising under state law, and Congress expressly preserved state law tort claims outside the jurisdiction of bankruptcy courts.[12]

Vickie's counterclaim is not related to the question of whether Pierce's defamation claim is dischargeable. Her tortious interference with a gift claim, if there is such a cause of action and she can prove its elements, could stand or fall regardless of whether his defamation claim was dischargeable or not. We need not reach the question whether, had Pierce sought damages for defamation as a creditor in bankruptcy, her counterclaim would be core, because he carefully avoided doing that. All that was required of the bankruptcy court in this case was to determine whether, if Pierce successfully proved in Texas what he pleaded in Texas, "willful and malicious injury" would preserve his judgment from discharge in Vickie's bankruptcy.[13] Whether a claim is dischargeable is a separate question from whether the claimant will prevail on the merits of that claim.[14] Because Pierce did not seek money from the bankruptcy estate for Vickie's defamation, or even estimation of the value of his claim,[15] Vickie's counterclaim

---

[11] *Accord Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985) (explaining the holding of *Marathon*).

[12] 28 U.S.C. § 157(b)(2)(B); *see also id.* § 157(b)(2)(O).

[13] 11 U.S.C. § 523(a)(6).

[14] *Grogan v. Garner*, 498 U.S. 279, 290 (1991) ("[N]ondischargeability [is] a question of federal law independent of the issue of the validity of the underlying claim.").

[15] 28 U.S.C. § 157(b)(2)(B).

could not affect money distributable to her creditors and should not be deemed "core."[16]

Even if all the above analysis is mistaken, Vickie's counterclaim was not "core" for another independent reason. She had already obtained her discharge in bankruptcy. Her counterclaim could not enlarge the amount of money distributable to her creditors, because of the discharge. She sought money for herself only, not a nickel of which would be shared among her creditors. Her claim was only nominally "by her bankruptcy estate," and was in substance her personal claim for a judgment of hundreds of millions of dollars of which she would get every penny. Her claim should therefore be deemed not "related to" her bankruptcy case. My reasoning follows our holding in *In re Fietz*[17] that once a chapter 13 plan was con-

---

[16]This is consistent with the Supreme Court's teachings in *Langenkamp v. Culp*, 498 U.S. 42 (1990), and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). In those cases, the outcome depended on whether the party claiming a jury trial had invoked the claims allowance process of the bankruptcy court by filing a claim against the estate. In *Granfinanciera*, the Court explained that because the petitioner had "not filed claims against the estate, [the trustee's] fraudulent conveyance action [did] not arise 'as part of the process of allowance and disallowance of claims.' Nor [was] that action integral to the restructuring of debtor-creditor relations. Congress therefore cannot divest petitioners of their Seventh Amendment right to a trial by jury." 492 U.S. at 58-59. In *Langenkamp* the parties claiming a right to jury trial had filed a claim against the estate, "thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court," and thus were not entitled to a jury trial. 498 U.S. at 45. Here, Pierce did not file a proof of claim seeking anything from the bankruptcy estate.

[17]*Fietz v. Great W. Sav. (In re Fietz)*, 852 F.2d 455, 457 (9th Cir. 1988) (holding that the standard for the bankruptcy court to exercise "related to" jurisdiction in an adversary proceeding is whether "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy."); *Menk v. Lapaglia (In re Menk)*, 241 B.R. 896, 907 (B.A.P. 9th Cir. 1999) ("Once the administration of the bankruptcy case has ended, the relation to the case becomes so attenuated that § 1334(b) 'related to' jurisdiction presumptively expires unless the court specifically retains jurisdiction.").

firmed, so that creditors could assert no interest in a subsequent recovery on a cross claim, the bankruptcy court lacked jurisdiction because the claim was not "related to" the bankruptcy case. Because the claim "could not have had any conceivable effect on administration of the bankruptcy estate" and would have been "beyond the reach" of the creditors, jurisdiction was absent.[18]

There is yet another independent reason, elementary and compelling even without the others, that the bankruptcy court was without jurisdiction over Vickie's counterclaim. Pursuant to the Bankruptcy Code, the bankruptcy court would not have had jurisdiction over Pierce's defamation claim even had he asserted it there, which he did not. 28 U.S.C. § 157(b)(5) requires that "the district court shall order that personal injury tort and wrongful death claims shall be tried in the district court." This statutory provision implements the holding in *Marathon* that Article III precludes bankruptcy courts from entering final judgments on tort claims founded on state law. Because bankruptcy judges cannot enter final judgment in such cases, they also "cannot try selected defenses in these tort cases. . . . The whole case, including defenses of all kinds, goes off to the district judge or the state court."[19] Pierce's defamation claim pending in Texas was for personal injury.[20] Vickie's claim, damages for tortious interference with a gift,

---

[18]*Fietz*, 852 F.2d at 459. *See also* the discussion of *Langenkamp* and *Granfinanciera* in footnote 16. Because Vickie's bankruptcy was discharged, Pierce's claim and Vickie's counterclaim no longer related to "the process of allowance and disallowance of claims" or were they "integral to the restructuring of debtor-creditor relations." *Granfinanciera*, 492 U.S. at 58-59.

[19]*Pettibone Corp. v. Easley*, 935 F.2d 120, 123 (7th Cir. 1991).

[20]*See In re Dillard Dept. Stores, Inc.*, 186 S.W.3d 514, 516 (Tex. 2006) (holding an employee's defamation claim fell within scope of an agreement requiring arbitration of claims for personal injuries); *see also Rizzo v. Passialis (In re Passialis)*, 292 B.R. 346, 348 (Bankr. N.D. Ill. 2003) (applying Texas law).

was also a personal injury claim if it is a recognized tort.[21] Thus her claim is also outside the jurisdiction of the bankruptcy court. Accordingly, had Pierce filed a proof of claim for damages for defamation, the bankruptcy court would have lacked jurisdiction to enter final judgment on that claim. Because Vickie's counterclaim was a personal injury claim, be it in defense of Pierce's defamation claim or an independent cause of action, the bankruptcy court would have lacked jurisdiction to enter final judgment on it.[22] Under *Marathon* and the statute, she could not evade Pierce's right to jury trial and an Article III court by shoehorning it into a bankruptcy filing, even had the discharge in bankruptcy not already rendered it not "related."

Pierce asserted a personal injury claim, defamation, in Texas, and prevailed in a five month jury trial in Texas. All he filed in Vickie's bankruptcy case was a claim for a declaratory judgment that whatever judgment he obtained in Texas would stand undischarged by Vickie's bankruptcy. Vickie used the vehicle of her bankruptcy case, even though it was effectively over, to file a personal injury claim against Pierce for interfering with a putative gift to her from his father. The bankruptcy court could not grant final judgment because her claim was for personal injury, was not related to the bankruptcy estate because she had obtained her discharge, and it was not "core." Pierce's constitutional rights to an Article III court and to jury trial as well as his statutory rights prevented jurisdiction in the bankruptcy court over Vickie's claim against him. When the bankruptcy court decided otherwise, it was without jurisdiction to do so.

---

[21] *See Marshall v. Marshall*, 547 U.S. 293, 313 (2006) ("Texas courts have recognized a state-law tort action for interference with an expected inheritance or gift, modeled on the Restatement formulation."); *King v. Acker*, 725 S.W. 2d 750, 754 (Tex. App. 1987) (discussing the availability of emotional distress damages under the Restatement (Second) of Torts § 774A (1977)).

[22] 28 U.S.C. § 157(b)(5).

4546                          IN RE MARSHALL

## APPENDIX

IN RE MARSHALL                                    4547

B10 (Official Form 10) - (Rev. 12/94)                                    1994 USBC, Central District of California

| U.S. Bankruptcy Court, Central District of California | PROOF OF CLAIM |
|---|---|

IN RE (Name of Debtor - if known, enter Last, First, Initial)
**VICKIE LYNN MARSHALL**

Case Number
**LA 96-12510 SB**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
(The person or entity to whom the debtor owes money or property)
**E. PIERCE MARSHALL**

Name and Address Where Notices Should be Sent
**c/o John P. Malko**
**Verner, Liipfert, Bernhard,**
**McPherson and Hand**
**600 Travis, Suite 2600**
**Houston, TX 77002**
Telephone No. **(713) 757-9200**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE FOR COURT USE ONLY

**FILE**

**RECEIVED**

JUN 1 2 1996

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

☐ replaces
☐ amends

a previously filed claim, dated:

Check here if this claim

1. BASIS FOR CLAIM
   ☐ Goods Sold
   ☐ Services Performed
   ☐ Money Loaned
   ☒ Personal injury/wrongful death
   ☐ Taxes
   ☐ Other (Describe briefly)

   ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
   ☐ Wages, salaries, and compensation (Fill out below)
   Your social security number _____
   Unpaid compensation for services performed
   from _____ to _____
        (Date)        (Date)

2. Date debt was incurred **see attached Ex. "A"**   3. If Court Judgment, Date Obtained **N/A**

4. CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim AND STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM $ _____
Attach evidence of perfection of security interest.
Brief Description of Collateral:
☐ Real Estate      ☐ Motor Vehicle
☐ Other _____
Amount of arrearage and other charges included in secured claim above, if any $ _____

☐ UNSECURED PRIORITY CLAIM $ _____
Specify the priority of the claim.
☐ Wages, salaries, or commissions (up to $4,000), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan - U.S.C. § 507(a)(4)
☐ Up to $1,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7)
☐ Other - 11 U.S.C. §§ 507(a)
   * Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

☒☒ UNSECURED NONPRIORITY CLAIM $ **Unliquidated**
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.
***see attached Exhibit "A"**

5. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:  $ **Unliquidated** | $ _____ | $ _____ | **Unliquidated**
                                              (Unsecured)   (Secured)   (Priority)   (Total)

☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

6. CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

7. SUPPORTING DOCUMENTS: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE FOR COURT USE ONLY

Date **6/11/96**

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)
**Joanna Kristin Snyder, Attorney**
**for E. Pierce Marshall**

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

BK 00127                    SER-6020

63

4548          In re Marshall

EXHIBIT A

BK 00128      SER-6021



BK 00129          SER-6022

65

4550                                    IN RE MARSHALL

## I. JURISDICTION

1.     The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(a).  This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(J).

2.     This adversary proceeding is commenced pursuant to 11 U.S.C. § 523(a)(6) and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

## II. PARTIES

3.     The Plaintiff is an individual and a resident of Dallas, Dallas County, Texas.

4.     The Defendant is the individual debtor in the above-captioned Chapter 11 case.  The Defendant may be served at 200 Ashdale Avenue, Los Angeles, California, 90049 and/or through debtor's counsel, Joel B. Weinberg, Biegenzahn & Weinberg, 21031 Ventura Blvd., Suite 905, Woodland Hills, California, 91364.

## III. BACKGROUND FACTS

5.     On August 4, 1995, J. Howard Marshall, II died.  Immediately, his alleged widow, the Defendant, began seeking a settlement from the proceeds of J. Howard Marshall, II's estate.  The Defendant and her attorneys, Diana Marshall and Suzanne P. Kornblit ("Kornblit"), instituted a plan to obtain a quick recovery from the estate of J. Howard Marshall, II by embarking on a tortious smear campaign against E. Pierce Marshall and his family.  The Defendant and her lawyers, Kornblit and Diana Marshall, sought to humiliate and embarrass E. Pierce Marshall in an effort to get him to influence a settlement in favor of the Defendant and her attorneys from the estate of Plaintiff's deceased father.  In their efforts to extort a swift settlement, the Defendant and her attorneys conspired to litigate their case in the press by making slanderous remarks and libelous statements with the intent that they would be published by the press.  At the time each of these statements to the press was made, each individual knew that her statement was being recorded or transcribed for publication nationally.

6.     After conducting this smear campaign for some time, the Defendant and her attorneys briefly ceased their slanderous and libelous remarks to the press and demanded by written communication intended for E. Pierce Marshall that E. Pierce Marshall and representatives of the estate of J. Howard Marshall, II meet and discuss the allegations which the Defendant and her attorneys had made, or else the Defendant and her attorneys would resume their campaign against E. Pierce Marshall.

BK 00130                           SER-6023

7.      Among other statements made to the press by the Defendant's attorneys in furtherance of this civil conspiracy, and in the course and scope of employment by the Defendant, was the statement by Diana Marshall to a reporter from the Houston Chronicle stating that Diana Marshall was "bothered" by "the blizzard of documents that were put in front of Howard Marshall to sign two weeks after his marriage to Anna Nicole Smith.... He signed all of them in an almost completely illegible fashion which makes sense because he couldn't read at the time, according to his doctors.... J. Howard Marshall's signature appears as sort of a squiggle with only the 'J' clearly readable.... The documents, signed about two weeks after the oilman's June 27, 1994 marriage, gave the son full control over the J. Howard Marshall, II living trust.... The effect of it was basically an attempt to remove Howard Marshall from control of his estate."

8.      Diana Marshall spoke these defamatory words in the course and scope of her employment for the Defendant. When Diana Marshall made these statements, she knew that the signatures of J. Howard Marshall, II were legitimate and were witnessed by several other persons. Diana Marshall knew that there was no evidence of any forgery, fraud or over-reaching by E. Pierce Marshall, but chose to make these false statements to the press anyway. She also neglected to tell the press about the other witnesses who were present at the time that J. Howard Marshall, II signed the documents. She also neglected to tell the press that the Defendant is alleging that J. Howard Marshall, II was capable of marrying the Defendant two weeks earlier and of understanding the implications of that act although Diana Marshall suggested in her defamatory comments that J. Howard Marshall, II lacked capacity to sign, or did not sign, the Trust documents. Despite her actual knowledge that her statements were false and defamatory, Diana Marshall made these statements and thereby committed libel and slander in furtherance of her employment by the Defendant.

9.      The defamatory meaning of her statements is clear to any reasonable person. Diana Marshall intended the listener and/or reader of her statements to understand that her statements meant E. Pierce Marshall had used fraud and/or forgery wrongfully to steal control of the J. Howard Marshall, II living trust from his own father. Because the reasonable interpretation of her statements accuses E. Pierce Marshall, of one or more criminal acts, Diana Marshall's statements constitute slander and libel per se. The clear defamatory meaning of Diana Marshall's statements is illustrated by a newspaper

BK 00131          SER-6024

67

4552                                IN RE MARSHALL

1   account published by writer Vincent Lupo. In his account, Lupo stated: "Diana Marshall . . . told the
2   Houston Chronicle recently that the law clearly entitles Smith to half of whatever her late husband
3   earned during their marriage. The lawyer is more worried about the documents Marshall purportedly
4   signed two weeks after his marriage to Smith. One of those documents gave the younger Marshall
5   power of attorney over his father whose signature is a mere 'squiggle, with only the J clearly
6   readable....'" It is clear that Diana Marshall's statements taken as a whole were intended to convey
7   either that the signatures were forged ("purportedly signed") or that the documents were signed by a man
8   who was not capable of understanding them.

9       10.    In further attempts to tarnish Plaintiff's reputation and in furtherance of her employment
10  by Smith and the civil conspiracy by the defendants, Kornblit has made numerous defamatory statements
11  to the press about E. Pierce Marshall. In one article, Kornblit characterized E. Pierce Marshall as
12  "greedy and miserly." In another, Kornblit stated that the Defendant "forgives Pierce" and that "our side
13  has always been cooperative....but we're just dealing with a real normal freak on the other side." These
14  defamatory personal attacks by Kornblit in furtherance of her employment by the Defendant and the civil
15  conspiracy culminated in a letter meant for E. Pierce Marshall's eyes in which Kornblit threatened to
16  go back to the press if her demands for a meeting with E. Pierce Marshall and other interested parties
17  were not met.

18      11.    At all times relevant to this claim, Diana Marshall and Kornblit were working within the
19  course and scope of their employment for the Defendant. The Defendant was informed of all activities
20  by her attorneys and knew of the smear campaign that her attorneys were conducting in the press. The
21  Defendant participated in the civil conspiracy in an effort to extort a speedy settlement.

22      12.    The conduct described above further constitutes intentional infliction of severe emotional
23  distress by the Defendant and her attorneys. As a proximate result of the Defendant's intentional
24  conduct, Plaintiff has suffered serious emotional distress, embarrassment and humiliation.

25

26

27

28

68

IV.  CAUSE OF ACTION

DETERMINATION OF DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(6)

13.    The Plaintiff incorporates each of the above paragraphs by reference.

14.    The Defendant is an individual debtor.

15.    The Plaintiff's claims against the Defendant are claims arising from the Defendant's willful and malicious acts which resulted in injury to the Plaintiff and/or the Plaintiff's property.

16.    Based on the foregoing, any discharge the Defendant may ultimately receive under 11 U.S.C. §§ 1141 or 727 will not discharge E. Pierce Marshall's claims against the Defendant.

WHEREFORE, the Plaintiff respectfully requests that the Court enter a judgment against the Defendant as follows:

1.    A determination that the Plaintiff's claims against the Defendant have not been discharged;

2.    An order granting the Plaintiff recovery for his reasonable costs and attorney's fees incurred herein and pre- and post-judgment interest as allowed by law; and

3.    An order granting the Plaintiff such other relief as is just.

Respectfully submitted this 7 day of May, 1996.

RUBINSTEIN & PERRY

By: _____
Joanne Murras Knauss
355 South Grand Avenue
Thirty-First Floor
Los Angeles, California 20071
(213) 246-1000 - Phone
(213) 680-3275 - Fax

ATTORNEYS FOR E. PIERCE MARSHALL

5

4554                            IN RE MARSHALL

1  |  **PROOF OF SERVICE: By Mail**
   |  1013A(3) CCP Revised 5/1/88
2  |
3  |  STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
   |  I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a
4  |  party to the within action; my business address is 355 S. Grand Avenue, 31st Floor, Los Angeles,
   |  California 90071.
5  |
   |  On June 11, 1996, I served the foregoing document described as:
6  |
7  |     **PROOF OF CLAIM**
8  |  by placing true copies thereof enclosed in sealed envelopes addressed as follows:
9  |  John P. Melko, Esq.                     Stephen F. Biegenzahn, Esq.
   |  VERNER, LIIPFERT, BERNHARD              Joel B. Weinberg
10 |  MCPHERSON AND HAND, CHARTERED           Biegenzahn & Weinberg
   |  2600 Texas Commerce Tower               21031 Ventura Blvd., Ste. 905
11 |  600 Travis                              Woodland Hills, CA 91364
   |  Houston, Texas 77002
12 |
13 |  Office of the U.S. Trustee
   |  Attn: Alvin Mar
14 |  221 N. Figueroa St., Ste. 800
   |  Los Angeles, CA 90012
15 |
16 |  I am readily familiar with the firm's practice of collection and processing correspondence for
   |  mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day
17 |  with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I
   |  am aware that on motion of the party served, service is presumed invalid if postal cancellation date
18 |  or postage meter date is more than one day after date of deposit for mailing in affidavit.
19 |  Executed on June 11, 1996, at Los Angeles, California.
20 |  **X**    I declare that I am employed by the office of a member of the bar of this court at whose
   |           direction the service was made.
21 |
22 |
23 |                              CHRISTY BARRETT
24 |
25 |
26 |
27 |
28 |

BK 00134          SER-6027

# CERTIFICATE OF SERVICE

I, Collin O'Connor Udell, declare as follows:

I am employed in the County of Hartford, State of Connecticut; I am over the age of eighteen years and am not a party to this action; my business address is 90 State House Square, Hartford, CT 06103, in said County and State.   On January 27, 2012, I served the following document:

**NOTICE OF MOTION AND MOTION FOR ENTRY OF JUDGMENT IN FAVOR OF THE ESTATE OF E. PIERCE MARSHALL IN ACCORDANCE WITH THE NINTH CIRCUIT'S MANDATE; MEMORANDUM OF POINTS AND AUTHORITIES**

Via the CM/ECF filing system on the parties registered on that system.

Executed on January 27, 2012

Collin O'Connor Udell

# CERTIFICATE OF SERVICE

I, John Hur, declare as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 354 South Spring Street, Suite 610, Los Angeles, California.  On January 27, 2012, I served the following document:

**NOTICE OF MOTION AND MOTION FOR ENTRY OF JUDGMENT IN FAVOR OF THE ESTATE OF E. PIERCE MARSHALL IN ACCORDANCE WITH THE NINTH CIRCUIT'S MANDATE; MEMORANDUM OF POINTS AND AUTHORITIES**

On the parties stated below, by the following means of service:

| | |
|---|---|
| Rusty Hardin<br>Rusty Hardin & Associates<br>1201 Louisiana, Ste 3300<br>Houston, TX 77002-5609 | John P Melko<br>Verner Liipfert Bernhard et al.<br>1111 Bagby, Suite 4700<br>Houston, TX 77002 |
| Jerry Don Jackson<br>Ware Snow Fogel & Jackson<br>1111 Bagby, 49th Fl<br>Houston, TX 77002 | Julia J Rider<br>Jeffer Mangels Butler & Marmaro<br>1900 Avenue of the Stars, 7th Fl<br>Los Angeles, CA 90067-5010 |
| Robert E Mangels<br>Jeffer Mangels Butler & Marmaro<br>1900 Avenue of the Stars, 7th Fl<br>Los Angeles, CA 90067-5010 | B Lee Ware<br>Ware Snow Fogel & Jackson<br>1111 Bagby, 49th Fl<br>Houston, TX 77002 |

**BY MAIL**: I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date.  I am familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on January 27, 2012

_____
John Hur