O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IN RE VICKIE LYNN MARSHALL,<br><br>Debtor. | Case No.: SACV-01-0097 DOC<br>Also docketed in: SACV-99-1372 DOC |
| | Related Bankruptcy Matters:<br>Case No.: LA 96-12510-SB<br>Adversary Nos.: LA 96-01838-SB<br>LA 98-1159-SB |
| VICKIE LYNN MARSHALL,<br><br>Plaintiff,<br><br>v.<br><br>FINLEY HILLIARD, ET AL.,<br><br>Defendants. | ORDER ON TWO MOTIONS FOR<br>SANCTIONS, TWO MOTIONS TO STAY,<br>AND DEFENDANTS' JOINT MOTION<br>FOR JUDGMENT ON THE PLEADINGS |

Before the Court are two Motions for Sanctions filed by Howard K. Stern in his capacity as Executor of the Estate of Plaintiff Vickie Lynn Marshall ("Plaintiff"), filed against Marshall Petroleum, Inc. ("MPI") (Dkt. 161) and the E. Pierce Marshall's ("Pierce") Successors In Interest, Trustees, and Affiliates ("Pierce's Estate") (Dkt. 162). These motions were both filed in case number SACV 99-1372, despite the fact that this case has been stayed for over a decade.

The conduct complained of all occurred during the proceedings in *In re Vickie Lynn Marshall,* Case No. SACV 01-97. As such, this Order shall also be docketed in Case No. SACV 01-97 and shall have full force and effect in that case.

Also before the Court are two Motions to Stay filed by Plaintiff: a Motion to Stay Entry of Judgment Pending Disposition of the Sanctions Motion (Dkt. 170) and a Motion to Stay Entry of Judgment Pending Disposition of the Texas Appeal (Dkt. 176) (collectively, "Motions to Stay").

Finally, before the Court is the Joint Motion of All Defendants for Judgment on the Pleadings filed by Finley Hilliard, as trustee of the J. Howard Marshall Living Trust and as executor of the Succession of J. Howard Marshall II (Louisiana) ("Hilliard"); Kenneth Farrar, as trustee of the J. Howard Marshall Living Trust ("Farrar"); and MPI (collectively, "Defendants") (Dkt. 165).

The Court held oral argument on these motions on two separate occasions. After considering the moving, opposing, and replying papers, as well as oral argument, the Court GRANTS the Motion to Stay Entry of Judgment Pending Disposition of the Sanctions Motion, DENIES the Motion to Stay Entry of Judgment Pending Disposition of the Texas Appeal. The Court GRANTS the Motion for Judgment on the Pleadings. The Court GRANTS the Motion for Sanctions against Pierce's Estate and DENIES the Motion for Sanctions against MPI. The Court also sua sponte issues on Order to Show Cause why Edwin Hunter should not be sanctioned. The next step in this matter will be a status conference, which the Court sets for August 13, 2013, at 8:30 a.m. At that conference, Plaintiff should be prepared to discuss what specific, remedial sanctions Plaintiff expects to pursue, and for what amounts. The Court will then set a further schedule as to briefing or hearings.

I.    **MOTIONS TO STAY**

Plaintiff first seeks to stay entry of judgment pending final disposition of the sanctions motions pending before the Court. Plaintiff also seeks to stay entry of judgment pending the resolution of her appeal of the Texas probate court judgment.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254, 57 S. Ct. 163 (1936). Whether to stay an action depends on a court's exercise of judgment in balancing potentially competing interests. *Id.* (citing *Kan. City S. Ry. v. United States*, 282 U.S. 760, 763 (1931); *Enelow v. N.Y. Life Ins. Co.*, 293 U.S. 379, 382 (1935)).

Among those interests to be weighed are "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). Where separate proceedings relate to a case, "[a] trial court may . . . find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case . . . and [this rule] does not require that the issues in such proceedings are necessarily controlling of the action before the court." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979).

"The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 709 (1997). Thus, the moving party "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis*, 299 U.S. at 255.

### a.  Motion to Stay Pending Disposition of Motions for Sanctions

Given that this Court below will grant the Motion for Sanctions against Pierce's Estate and issue an Order to Show Cause why sanctions should not be issued against Edwin Hunter, it is prudent to grant a stay of entry of judgment in *In re Vickie Lynn Marshall*, SACV 01-97.[1] Given that Pierce's Estate may owe money to Plaintiff after proceedings that follow from this

---

[1] It is not clear as to why Plaintiff sought a stay in SACV 99-1372, when the judgment it seeks to stay is in *In re Vickie Lynn Marshall*, 01-97. As was the case with Motions for Sanctions misfiled in SACV 99-1372, this Order shall be docketed in both cases.

Order, it seems counterproductive to enter judgment in Pierce's favor. Thus, the entry of judgment as per the Ninth Circuit mandate shall be STAYED pending final resolution of sanctions.

Thus, this Motion to Stay Pending Disposition of Motions for Sanctions is GRANTED.

**b. Motion to Stay Pending Disposition of Texas Appeal**

As an initial matter, Defendants' Request for Judicial Notice is GRANTED. Each of the documents in question is a court record, and under Federal Rule of Evidence 201, the Court may take judicial notice of court filings and other matters of public record, as they are sources whose accuracy cannot be questioned. See Fed. R. Evid. 201(b); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

Plaintiff seeks a stay despite the fact that it sought—and was denied—rehearing from the Supreme Court on the same issue. In Plaintiff's Petition for Rehearing, 2011 WL 2790724, she requested that the Supreme Court direct the Ninth Circuit on Remand to stay the appeal pending the resolution of the Texas Probate Appeal. The Supreme Court summarily denied this petition for rehearing. *Stern v. Marshall*, 132 S.Ct. 56, 180 L.Ed.2d 924 (Aug. 15, 2011). Not only does Plaintiff fail to explain why this Court should grant relief that the Supreme Court has denied, but Plaintiff does not mention the Supreme Court's denial of her petition for rehearing. Further, Plaintiff does not explicitly address any of the factors to be considered in granting a stay. For those reasons, Plaintiff has far from met her burden of establishing the need for a stay. *Clinton*, 520 U.S. at 709.

Plaintiff's Motion for a Stay Pending Disposition of the Texas Appeal is DENIED.

**II.   MOTION FOR JUDGMENT ON THE PLEADINGS**

Before the Court is the Joint Motion of All Defendants for Judgment on the Pleadings (Dkt. 165) filed by Finley Hilliard, as trustee of the J. Howard Marshall Living Trust and as executor of the Succession of J. Howard Marshall II (Louisiana) ("Hilliard"); Kenneth Farrar, as trustee of the J. Howard Marshall Living Trust ("Farrar"); and MPI. After carefully considering the moving, opposing, and replying papers, the Court hereby GRANTS the Motions for Judgment on the Pleadings.

Defendants seek Judgment on the Pleadings under the principles of collateral estoppel and res judicata from the final judgment of the Texas Probate Court, as well as the decisions of the United States Supreme Court in *Stern v. Marshall*, 131 S.Ct. 2594 (2011) and the Ninth Circuit Court of Appeals in *Marshall v. Stern* (*In re Marshall*), 600 F.3d 1037 (9th Cir. 2010).

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). For purposes of such a motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967)). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Id.* (citing *Doleman*, 727 F.2d at 1482); accord. *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978-79 (9th Cir. 1999). Thus, the defendant is not entitled to judgment on the pleadings if the complaint raises issues of fact, which, if proved, would support recovery. Likewise, the plaintiff is not entitled to judgment on the pleadings if the answer raises issues of fact or an affirmative defense, which, if proved, would defeat plaintiff's recovery. *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).

"Judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Hal Roach*, 896 F.2d at 1550 (citing Fed. R. Civ. P. 12(c)). However, the Court may consider facts that "are contained in materials of which the Court may take judicial notice." *Heliotrope*, 189 F.3d at 981 (citing *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994)). A Court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

As an initial matter, the Court GRANTS Defendants' Request for Judicial Notice of Exhibits A-D. Each of these documents is a court record from the present case or its counterpart, *In re Marshall*  (SACV 01-97; Nos. 2-56002 and 02-56067 in the Ninth Circuit). Under Federal Rule of Evidence 201, the Court may take judicial notice of court filings and other matters of public record, as they are sources whose accuracy cannot be questioned. *See* Fed. R. Evid. 201(b); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006). Defendants argue that the Texas Probate Action's final decision bars the present action under both collateral estoppel and res judicata. Defendants also argue that the Ninth Circuit's Mandate in *In re Marshall*, bars any contrary judgment in the present case. Plaintiff does not attempt to rebut the factual or legal arguments in Defendants' Motion; rather, Plaintiff once again attempts to rely on allegations of sanctionable conduct, which has no relevance to the entry of judgment based on res judicata principles. Sanctions are an issue that will be determined separately from the merits of this case.

Defendants are correct that the present case is barred by the final judgment in the Texas Probate Action. The Ninth Circuit's decision in *In re Marshall* affording preclusive effect to the Texas Probate decision is outcome determinative here. In the *In re Marshall* decision, the Ninth Circuit recognized that the Texas probate court "upheld the validity of [Howard's] estate plan and estate planning documents, finding that [Howard] knowingly effected his estate plan free from the undue influence or coercion of his son . . . [and] that [Howard] did not intend to give [Vickie] a gift from the assets that passed through his will or that were held in his living trust." *In re Marshall*, 600 F.3d at 1039. The Ninth Circuit held that Pierce was entitled to judgment as a matter of law because the Texas court's findings were fatal to Vickie's tortious interference claim and that Texas decision was to be afforded preclusive effect. *Id.* at 1039, 1064. Because Plaintiff's claims in the present case track her counterclaims against Pierce in *In re Marshall* and her claims against Pierce in Defendants in the Texas probate case, the Court must reach the same result as the Ninth Circuit and hold that the Texas probate decision precludes Plaintiff's claims in the present case. Plaintiff's claims here, like those in *In re Marshall*, cannot stand given the Texas probate court's ruling on Howard's estate. Under the doctrine of collateral

estoppel, a party may not relitigate an issue if: "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated; (3) there was a final judgment on the merits; and (4) the person against whom collateral estoppel is asserted was a party to or in privity with a party in the previous action." *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010). All four criteria are undoubtedly met in the present case, such that the Ninth Circuit's *In re Marshall* decision is grounds for granting Defendants' Motion for Judgment on the Pleadings.

Plaintiff points to no facts that would distinguish this case from *In re Marshall* or the Texas probate case. The Texas probate case was deemed to have preclusive effect and so too shall it preclude Plaintiff's claims here.

For the aforementioned reasons, the Motion for Judgment on the Pleadings is hereby GRANTED.

### III.   MOTIONS FOR SANCTIONS

#### a.  The rule of mandate does not preclude this Court from issuing sanctions

To decide if this Court has the authority to consider Plaintiff's motion for sanctions, it must analyze the rule of mandate. The rule of mandate "presents a specific and more binding variant of the law of the case doctrine." *Ischay v. Barnhart,* 383 F. Supp. 2d 1189, 1214 (C.D. Cal. 2005) (quoting *Magnesystems, Inc. v. Nikken, Inc.,* 993 F. Supp. 944, 949 (C.D. Cal. 1996)). In construing the reach of a mandate, courts must determine which issues were actually decided by the appellate court. District courts "are not free to decide issues on remand that were previously decided either expressly or by necessary implication on appeal." *Michandani v. United States,* 836 F.2d 1223, 1225 (9th Cir. 1988); *see also id.* ("The mandate is controlling as to all matters within its compass, but leaves the district court any issue not expressly or impliedly disposed of on appeal."); *U.S. v. Kellington,* 217 F.3d 1084, 1093 (9th Cir. 2000) ("In construing a mandate, the lower court may consider the opinion the mandate purports to enforce as well as the procedural posture and substantive law from which it arises. . . . the ultimate task is to distinguish matters that have been decided on appeal, and are therefore beyond the jurisdiction of the lower court, from matters that have not."). The lower court's actions must

always "be consistent with both the letter *and the spirit* of the higher court's decision." *Ischay,* 383 F. Supp. 2d at 1214.

Here, this Court must decide whether the Ninth Circuit decided the issue of sanctions, either expressly or by necessary implication. Neither party argues that the issue was expressly decided, as the Ninth Circuit has neither upheld nor overturned any lower court order on sanctions. MPI and Pierce's Estate argue that the Ninth Circuit's ruling that "judgment be entered in favor of the Estate of Pierce Marshall" leaves no room for this Court to consider the issue of sanctions. *In re Marshall,* 600 F.3d 1037, 1040 (9th Cir. 2010).[2]  For the reasons that follow, this Court disagrees.

First, the Ninth Circuit never directly or indirectly considered the issue of sanctions. "[C]ourts are often confronted with issues that were never considered by the remanding court. In such cases, broadly speaking, mandates require respect for what the higher court decided, not for what it did not decide." *Kellington,* 217 F.3d at 1084 (quoting *Biggins v. Hazen Paper Co.,* 111 F.3d 205, 209 (1st Cir. 1997)). Here, the Ninth Circuit never considered the substantive merits of any sanctions order. In fact, in *In re Marshall,* the Ninth Circuit mentioned the sanctions imposed by the bankruptcy court before concluding that its "discussion of these matters will be limited because the parties agreed that there are no sanctions issues before us on appeal." 600 F.3d at 1046, n.17. In so noting, the Ninth Circuit expressly recognized that sanctions played no role in its ruling.

Second, the awarding of sanctions would not be contrary to the spirit of the Ninth Circuit's mandate. The act of issuing sanctions is unique because, unlike other acts of the Court, it may be conducted entirely separately from any decision on the merits. The Supreme Court has made clear that sanctions may be awarded after the termination of a suit. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S . 384, 395-96 (1990). There, the Supreme Court held that just as imposing costs, attorney's fees, and contempt sanctions, "a Rule 11 sanction is not a judgment on the merits of an action." *Id.* at 396. The distinction from a decision as to the merits is that

---

[2] This ruling was made final by the Ninth Circuit's Mandate on September 14, 2011, which stated that the judgment of the Court entered March 19, 2010 was to take effect on that date. *See* Docket 545.

sanctions "requires the determination of a collateral issue: whether the attorney has abused the judicial process, and if so, what sanction would be appropriate. Such a determination may be made after the principal suit has been terminated." *Id.*; s*ee also In re Exxon Valdez,* 102 F.3d 429, 431 (9th Cir. 1996); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 56 (1991) (upholding sanctions issued pursuant to district court's inherent power that were not assessed until the conclusion of the litigation).

This case is thus distinguishable from *Stamper v. Baskerville,* an out of circuit case that is the primary case that MPI and Pierce's Estate cite. 724 F.2d 1106 (4th Cir. 1986). There, the Fourth Circuit ruled that the district court had violated the mandate to dismiss the claims at issue. *Id.* at 1107. The court held that "[c]ompliance with an order to relinquish jurisdiction necessarily precludes the lower court from taking any further action other than dismissal, for to do so would involve retaining jurisdiction." *Id.* at 1108. Here, the same concerns about jurisdiction do not apply, as they would if the Court was considering a motion going to the merits of the case and not a sanctions motion.

The Court has the inherent power to issue sanctions in order to "protect the due and orderly administration of justice and maintain the authority and dignity of the court." *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir. 1997) (quoting *Cooke v. United States,* 267 U.S. 517, 539, 45 S. Ct. 390, 395-96, 69 L. Ed. 767 (1925)). The Court has an obligation to ensure that parties do not make a mockery of the justice system. This duty does not end with the entry of judgment.

Thus, this Court concludes that possible sanctions against the Estate or MPI would not be inconsistent with a judgment in favor of Pierce. As the Supreme Court has held, "[T]he imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation." *Chambers,* 501 U.S. at

53.[3] For that reason, the rule of mandate does not bar this Court from considering the issue of sanctions.

### b.  The Court's inherent power to sanction

It is well established that courts have the inherent power to issue sanctions in response to abusive litigation practices. *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 764-66 (1980). Courts may levy sanctions against attorneys, clients, and pro se litigants, including the prevailing party. *Alyeska Pipeline Serv. v. Wilderness Society,* 421 U.S. 240, 258-59 (1975). This inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers,* 501 U.S. at 43. The Court must find bad faith to issue monetary sanctions under its inherent power. *Id.* at 44-45.[4]

---

[3] *See also Square Const. Co. v. Washington Metro. Area Transit Auth.,* 800 F.2d 1256, 1266-67 (4th Cir. 1986) (imposing sanction of costs, expenses, and attorney's fees on prevailing party who engaged in "misconduct in every sense of the word" with its "obdurate, obstinate, and vexatious conduct"); *Lipsig v. Nat'l Student Mktg. Corp.,* 663 F.2d 178, 182 (D.C. Cir. 1980) (holding that "even a winner may have to pay obstinacy fees" where the prevailing party engaged in dilatory tactics, consistently failed to meet deadlines, misused the discovery privilege, and seriously misled the Court by misquoting or omitting material portions of evidence); 10 Moore's Federal Practice § 54.171(2)(c)(iv) ("[W]hen a prevailing party has been guilty of bad faith in some discrete portion of the litigation, fees may be assessed against that prevailing party under the bad faith exception.").

[4] The bad faith requirement "sets a high threshold" and a specific and personal finding must be made before imposing sanctions. *Mendez v. County of San Bernardino,* 540 F.3d 1109, 1132 (9th Cir. 2008). *See also Primus*, 115 F.3d 644 (9th Cir. 1997) (any sanctions must be based on a party's "own improper conduct without considering the conduct of the parties or any other attorney"). "Bad faith may be found not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Piper,* 447 U.S. at 766 (internal citations omitted). For example, a party may demonstrate bad faith by "delaying or disrupting the litigation or hampering enforcement of a court order." *Primus,* 115 F.3d at 649 (quoting *Hutto v. Finney,* 437 U.S. 678, 689, n. 14, 98 S. Ct. 2565, 2573 n.14, 57 L. Ed. 2d 522 (1978)). *See also Mark Indus., Ltd. v. Sea Captain's Choice, Inc.,* 50 F.3d 730, 732 (9th Cir. 1995) (district courts have discretion to issue inherent powers sanctions "for willful abuse of the judicial process or bad faith conduct"); *Fink v. Gomez,* 239 F.3d 989, 992 (9th Cir. 2001) ("In *Chambers,* the Court left no question that a court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting litigation, or has taken actions in the litigation for an improper purpose."). Additionally, a finding of recklessness when combined with "an additional factor such as frivolousness, harassment, or an improper purpose" may also justify sanctions pursuant to the court's inherent power. *B.K.B. v. Maui Police Dept.,* 276 F.3d 1091, 1108 (9th Cir. 2002). *Cf. United States v. Stoneberger,* 805 F.2d 1391 (9th Cir. 1986) (mere tardiness not sufficient for inherent power

Sanctions under the court's inherent power have been upheld in a variety of circumstances. *See, e.g., Leon v. IDX Sys. Corp.,* 464 F.3d 951, 958-59 (9th Cir. 2006) (destruction of potentially relevant computer files warranted sanction of dismissal and attorneys' fees); *Lahiri v. Universal Music & Video Distribution Corp.,* 606 F.3d 1216, 1222 (9th Cir. 2010) (upholding sanctions award of partial attorneys' fees for "cumulative effect of litigation conduct, including hiring the judge's former law firm in an attempt to cause recusal and have the sanctions hearing in front of another judge); *In re Itel Sec. Litig.,* 791 F.2d 672, 675 (9th Cir. 1986) (attorneys' fees appropriate where counsel filed objections to exact fee concessions in an action pending before another court).

Inherent power sanctions are also particularly appropriate for fraud practiced upon the court. *See Chambers,* 501 U.S. at 54. Fraud upon the court "includes both attempts to subvert the integrity of the court and fraud by an officer of the court" and "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Pumphrey v. K.W. Thompson Tool Co.,* 62 F.3d 1128, 1131 (9th Cir. 1995). In *Pumphrey,* for example, the court found that the parties in question had "engaged in a scheme to defraud the jury, the court, and [their opponent], through the use of misleading, inaccurate and incomplete responses to discovery requests, the presentation of fraudulent evidence, and the failure to correct the false impression created by [a witness' testimony]." *Id.* The Ninth Circuit held that "the end result of the scheme was to undermine the judicial process, which amounts to fraud upon the court." *Id. See also Combs v. Rockwell Int'l Corp.,* 927 F.2d 486 (9th Cir. 1991) (district court did not err in dismissing case as sanction for falsifying a deposition).

Here, there is considerable evidence showing the bad faith of Edwin Hunter and Pierce Marshall. Because it has been quite some time since the Court's original findings of fact, they will be detailed here at some length. The germane excerpts from the original opinions appear in this Opinion as indented and single-spaced, with headings and renumbered footnotes in square

---

sanctions); *Zambrano v. City of Tustin,* 885 F.2d 1473 (9th Cir. 1989) (inherent power sanctions inappropriate for inadvertent conduct).

brackets to set them off from this Order's text. After a long excerpt, a "*      *       *" notation marks the return to this Order. First, the following excerpt is from *In re Marshall*, 275 B.R. 5 (C.D. Cal. 2002):

> "Hunter represented MPI, J. Howard, and a number of the various trusts, all of which are now controlled by Pierce." *Id.* at 29.

> "For the reasons set forth below, the Court finds that Hunter lacks credibility as a witness. First and foremost, Hunter's lack of credibility was consistently demonstrated to the Court by numerous falsehoods made before the Court that were directly contradicted by documentary evidence in the case and, in some instances, by other witnesses on Pierce's side. Second, Hunter has several motives to distort the facts in this case: to preserve a settlement offer from the IRS on the value of MPI and Koch Industries in the continuing gift tax litigation, in which he continues to represent the Marshall family interests, now managed by Pierce; and to endear himself to Pierce, who has inherited J. Howard's wealth, whom Hunter admits was one of his largest clients. Finally, Hunter's lack of credibility was demonstrated by dishonest actions and his apparent willingness to abuse the high standing of his close family members." *Id.* at 31.

> "Hunter's false statements are detailed first.  The statements include, but are not limited to the following:

> **[1.     Hunter's statement that he did not draft a "catch-all trust."]**

> During the proceedings before this Court, Hunter was asked where the draft of the "catch-all" trust was. Hunter claimed that he did not know. At that point in the proceedings, counsel for Vickie argued to the Court that it should sanction Pierce for his discovery abuses by designating as established that such a draft trust existed and would have been a mechanism to make gifts to Vickie. Hunter then stated that he "suddenly remembered" that the "catch-all" trust referred to a voting trust agreement for Compagnie Victoire. Hunter's "sudden" recollection, after six years of litigation in this matter is incredible on its face. Moreover, such a recollection is contradicted by the facts of the case.

> On December 15, 1992, Jeff Townsend sent Hunter a letter urging him to finish his work on four documents related to Vickie, all of which were to be presented to J. Howard at a meeting later that month. (Ex. 58.) Those documents were a draft-prenuptial agreement, a family farm corporation, a modeling corporation, and a "catch-all" trust. Hunter's billing records indicate that he and other members of the Hunter Firm worked on the first three documents prior to his meeting with J. Howard on December 22, 1992. (Ex. 649, p. 4.)

> Not only do Hunter's billing records show his work on the first three items referenced in Townsend's December 15, 1994 letter, but they also demonstrate that he and members of the Hunter Firm worked on the "catch-all" trust. On November 10, 1992, his partner Glynn Blazier had a "[t]elephone conference with Finley Hilliard and Jeff Townsend regarding proposal to create trust for estate planning

purposes." (Ex. 649, p. 2.) Additionally, Hunter's billing records show that he had a telephone conference with Blazier regarding the same. (Ex. 649, p. 2.). Hunter and Blazier again held a conference on a proposed trust on December 16, 1994. (Ex. 649, p. 3.) And finally, Hunter's billing records show that Glynn Blazier drafted a trust document on December 21, 1994. (Ex. 649, p. 4.)

That work on a "catch-all" trust was undertaken is also corroborated by Sorensen's handwritten agenda for the meeting with J. Howard, where he includes discussion of a GRIT [Grantor Retained Income Trust], which was never produced. (Ex. 3245.)

Hunter claims that the term "catch-all" trust was used by Townsend because he was an oil and gas lawyer and thus did not understand the complexities of estate planning.[5] Townsend, however, as a corporate lawyer, would have been well aware of a voting trust and how it works, and would not mistakenly have referred to it as a "catch-all" trust.

Hunter further testified that the voting trust for Compagnie Victoire was necessary because Vickie was worried that she would not control the company because J. Howard owned all the stock. Thus, according to Hunter, a voting trust would assure her that she would control the company. Documents in evidence, however, show that Compagnie Victoire was not created until 1993 and that Vickie did not know of its existence until after its creation. Thus, Hunter could not have been preparing a document to ease Vickie's concerns about control of a corporation that she had no idea existed at the time. Moreover, the evidence shows that the voting trust for Compagnie Victoire was not put into place until several months later. Furthermore, the Court is quite confident that, based upon her limited intelligence and understanding of business affairs, Vickie would not understand the workings of a voting trust. Hunter later claimed that the "catch-all" trust was subsumed into Compagnie Victoire.

Unfortunately, the Court must conclude that Hunter was untruthful. A draft "catch-all" trust was prepared, or, at the least, J. Howard directed Hunter to prepare one.

**[2.    *Hunter's statement that he did not know when the Fine Tuning Memo (Ex. 310a) was originally drafted.***]**

In fact, Hunter knew full well that the Fine Tuning Memo was drafted on July 8, 1994. Hunter's billing records indicate that he drafted "Marshall post-matrimonial plan" on July 8, 1994. That corresponds with a statement in the Fine Tuning Memo that J. Howard had not told his children of his marriage to Vickie as of July 8, 1994. (Ex. 310a, p. 1.)

In the bankruptcy court, Hunter claimed that the "Marshall post-matrimonial plan" referred to in the billing records was the Amended and Restated

---

[5] [Townsend did, however, carry out several personal, estate related, legal services for J. Howard, including investigating the possibility of adopting Vickie's son.]

Living Trust instrument dated July 13, 1994. (T2247.)[6] That was demonstrated to be false because Hunter's billing records indicate that Cherry Doucet drafted the Amended Living Trust on July 11, 1994, after receiving instructions from Hunter. (Ex. 649, p. 103).

This is important because it shows that the July 13, 1994 Amended and Restated Living Trust was changed to comport with the goals set forth in the Fine Tuning Memo which was drafted July 8, 1994, and therefore the Court can gain insight into the changes to the Living Trust by reference to the Fine Tuning Memo.

[**3. Hunter's statement that the reference "mischief" in the Fine Tuning Memo did not refer to gifts for Vickie.**]

Hunter's Fine Tuning Memo states that his plans would leave "less for mischief (and Miss Cleavage)." (Ex. 310a, p. 12.) Although Hunter admitted that "Miss Cleavage" referred to Vickie, he denied that "less for mischief" referred to allowing J. Howard to have less money than he could give to Vickie. Instead, Hunter disingenuously claimed that the phrase meant less for unspecified "waste." This deception was intended to hide what Hunter's perceptions about J. Howard were and his efforts to strip J. Howard of his assets.

[**4. Hunter's statement that he did not cause the Assignment, Promissory Note, and Pledge (Exs. 287-289), to be backdated.**]

The Assignment, Promissory Note, and Pledge all purport to be dated June 1, 1994.  However, Hunter's billing records show that Cherry Doucet of the Hunter Firm worked on "revisions of pledge" on July 11, 1994. (Ex. 649, 103, #7535.) There is no record of a meeting with Pierce or J. Howard to sign these notes on June 1, 1994, nor are there records indicating that Hunter prepared these documents prior to June 1, 1994. Hunter's Fine Tuning Memo, which was drafted after J. Howard's June 27, 1994 marriage to Vickie, addresses these transactions and indicates that they should occur in the future. (Ex. 310a, p. 6, VII.A.4.)

In an attempt to explain away his billing records indicating that he had worked on these documents, Hunter furthered his dishonesty by suggesting that those records could refer to another pledge, but did not say what pledge that was, or show that it had ever been produced. Finally, Hunter suggests that maybe J. Howard and Pierce caused the documents to be backdated after they were delivered. However, the dates on the documents are all typed, not handwritten in.

---

[6] [As a result of this perjured testimony, there are portions of the bankruptcy court's proposed findings of fact and conclusions of law which mistakenly refer to the Amended and Restated Living Trust as the Fine Tuning Instrument. Pierce's Amended Assignments of Error often quibble with the bankruptcy court's findings on the matter. (*See, e.g.*, Am. Assignments of Error ¶ 25: "There is no evidence that J. Howard ever saw or was informed of the contents of the Fine Tuning Document."; Am. Assignments of Error ¶ 27: "The Fine Tuning Document does not purport to change the provisions of the Living Trust . . . ."; *see also, e.g.*, Am. Assignments of Error ¶¶ 26, 28.) These contentions are the height of bad faith. *See* Fed. R. Civ. P. 11(b)(2), 11(b)(4).]

**[*5.     Hunter's statement that he did not cause the donation of the [Grantor Retained Annuity Trust] to the J. Howard Marshall, II Living Trust to be backdated.*]**

The act of donation document purports to be dated January 13, 1994. Hunter testified that he did not backdate the document. That is contradicted by Hunter's Billing records which indicate that on July 12, 1994, Cherry Doucet of the Hunter Firm "[d]rafted donation of interest in [Grantor Retained Annuity Trust]." The January 1994 date is printed like the rest of the document.

**[*6.     Hunter's Statement that Pierce was never shown the Fine Tuning Memorandum (Ex. 310a).*]**

Hunter's billing records for July 8, 1994 indicate that he drafted the Fine Tuning Memorandum and faxed it to Pierce. (Ex. 649, p. 102.  # 7662.) ("Draft Marshall post-matrimonial plan; fax to E. Pierce Marshall . . . ."). This contradicts his statement of loyalty to J. Howard and demonstrates that he was working on Pierce's behalf.

**[*7.     Hunter's statement that he researched annulling J. Howard's marriage to Vickie to defend J. Howard from any actions taken by Pierce.*]**

Hunter said that J. Howard told Hunter that he was very much in love with Vickie. Hunter, however, began researching annulment in the Fine Tuning Memo. Hunter testified that the reason he began researching annulment is that he was concerned that J. Howard would ask him if Pierce, holding J. Howard's power of attorney, could seek to have J. Howard's marriage annulled. This is completely inconsistent with Hunter's testimony that Pierce always followed his father's orders. Neither Hunter nor J. Howard would be concerned with Pierce seeking to annul J. Howard's marriage to Vickie if Pierce respected his father's decisions and never interfered with J. Howard's relationship with Vickie. Hunter was therefore either lying as to the degree of control exercised by J. Howard over Pierce, or, as the Court finds, as to whom Hunter was preparing the Fine Tuning Memo for.

**[*8.     Hunter's statement that he believed, in May 1995, that J. Howard would live for 5 years*]**

This is relevant because on May 26, 1995,[7] J. Howard allegedly approved two documents which changed his estate plan. By the first document, the J. Howard Marshall, II [Grantor Retained Annuity Trust], created in August 1993, sold back to MPI 47,288 shares of MPI. (Ex. 3376.) The other document was for sale of 63,051 MPI shares to MPI for a private annuity. (Ex. 3770.) Neither of these annuities were scheduled to make payments to J. Howard until March 1996. Hunter, like Pierce, testified that these annuities would have been economically beneficial to J. Howard had he lived for another five years. Hunter testified that he believed at the time that J. Howard would live for another five years. This is pure fiction.

---

[7] [This document may also have been backdated, *see infra*.]

-15-

In May 1995, J. Howard was already ninety years-old, and even reference to actuarial tables would suggest that he had less than five years to live. In fact, a year earlier, Hunter had done just that, finding that at 89, J. Howard had less than five years to live. (Ex. 310a, p. 7-8.) By May 1995, J. Howard had spent a large part of the previous five months in the hospital. On January 24, 1995, J. Howard had been rushed to the  Hospital after his heart had stopped, and was only revived after CPR was administered. Townsend testified that he began looking into funeral arrangements for J. Howard in January 1995. Townsend testified that J. Howard never regained a healthy appearance in 1995, and he several times believed that J. Howard was close to death. If J. Howard's advanced age, his near-death experiences, the obvious breakdown of his physical health, his extended hospital stays, and his need for 24 hour nursing care did not make it clear enough to Hunter that J. Howard would not live for another five years, in Spring 1995, J. Howard's physician, Dr. Reed, had diagnosed him with terminal, untreatable and inoperable stomach cancer. In April 1995, Dr. Reed opined that J. Howard might have as little as three months to live." *Id.* at 30-33.

"[*9.    Other actions that demonstrated Hunter's lack of credibility*]

The Court's judgment of Hunter's credibility does not rest merely on these specific lies, made under oath before this Court (some of which were lies that he had been previously made before the bankruptcy court). The Court also finds that his central role in the plan to drain J. Howard of his assets, which was undertaken in part to prevent J. Howard from making a substantial gift to Vickie, undermines his credibility.

This Court is not the first to question Hunter's character. Besides the bankruptcy court, which found that Hunter had conspired with Pierce to alter documents and deprive Vickie of her intended gift, Harvey Sorensen's firm, Foulston & Seifkin, found Hunter's ethics questionable. On June 20, 1994, Andrew Wright[8] prepared a research memo for Harvey Sorensen to advise him on his professional responsibilities relating to what Sorensen believed was Hunter's "probable professional misconduct" in altering the [Grantor Retained Annuity Trust], as discussed in Part IV.D.8.ii, *infra*. (Ex. 281, Memo p. 3.) According to Wright, Hunter had acted incompetently, disreputably, had refused to comply with tax regulations, and had done so with the intent to defraud. (Ex. 281, Memo pp.5, 7.) Wright concluded that Hunter's conduct would be viewed by the Department of Treasury as "disreputable, intentionally fraudulent, and perhaps incompetent." (Ex. 281, Memo p. 7.) Wright recommended that Sorensen report Hunter to the relevant disciplinary bodies. (*Id.*)[9]

---

[8] [It appears that Andrew Wright is another attorney in Sorensen's firm.]
[9] [While the Court has no information as to Sorensen's eventual actions, Foulston & Siefkin informed Pierce and J. Howard that they would not second-chair the tax litigation behind Hunter.  Although no reason was given to the Court, the Court believes that Sorensen and his firm did so in a successful effort to disassociate themselves from Hunter.]

Finally, the Court is concerned that Hunter acted unethically in attempting to impress Pierce with his family's judicial prominence.  Vickie's counsel argued that Hunter and Pierce were involved in planning to use these connections to gain an advantage in dealing with J. Howard's estate.

The Fine Tuning Memorandum prepared by Hunter includes statements that deal with estate planning once J. Howard had married Vickie.  (Ex. 310a.)  Up until Hunter drafted the Fine Tuning Memorandum on July 8, 1994, J. Howard had been co-trustee, along with Pierce, of the J. Howard Marshall, II Living Trust.  On page 3 of that Memo, Hunter addresses concerns about how to choose a successor trustee upon J. Howard's death.  On page 3, paragraph d, Hunter lists numerous options. The last of these is to "let longest serving federal judge in Texas appoint successor." (Ex. 649, p. 3.) This suggestion is out of place considering that state courts, not federal courts, are primarily responsible for probate matters.  *See Marshall III*, 264 B.R. at 621. In the next sentence, Hunter's thinking becomes more clear: "[sidebar . . . my father is now the longest serving federal judge in the United States]" (Ex. 649, p. 3.) (Brackets in original.)

Hunter's father is the Honorable Edwin F. Hunter, Jr., Senior District Judge for the Western District of Louisiana, and as Hunter's Fine Tuning Memorandum indicates, he is the longest serving federal judge in Louisiana and the United States, having been appointed to the Bench by President Eisenhower in 1953.

When taken in context of the other events in this saga, Hunter's self-styled "sidebar" is not an innocuous note to himself.  On the next line of the Fine Tuning Memorandum, Hunter's suggestion for the Living Trust was to "[p]ermit the trustee to re-situs trust if it gives an advantage." (Ex. 310a, p. 3.)  Indeed, the Living Trust was later re-sited to Louisiana, where Pierce initiated succession proceedings.  *See Howard Marshall Charitable Remainder Trust*, 709 So. 2d at 662.  Had Hunter's plans been followed through with, the longest serving federal judge in the state of the trusts' new situs, his father, would have been given authority to choose a successor trustee.  There is no evidence before the Court that these thoughts ever evolved past the planning stages, or that Judge Hunter was even aware of his son's plan. However, these events demonstrate Hunter's apparent willingness to exploit his father's high position.

Vickie's counsel points out, however, that this is not the only instance where Judge Hunter is referred to in connection with this matter.  Vickie's counsel also argued that Hunter and Pierce were involved in attempting to solicit advice from a judicial officer.  On January 27, 1995, Harry Winston sued J. Howard over a bounced check that he had written while purchasing jewelry for Vickie.  Disputes arose between Vickie and Pierce, as J. Howard did not have the cash to cover the check.  Pierce had been responsible for solving the problem and returning the jewelry to Winston.  Vickie, however, never returned the jewelry, and Harry Winston sued.  On April 22, 1996, Judge Audrey Collins of the Central District of California, issued findings of fact and conclusions of law in that matter, and entered judgment in favor of Harry Winston.  This ruling upset Pierce.  In response, Pierce sent a memorandum to Edwin Hunter, outlining numerous

strategic alternatives for the Harry Winston case, as well as for Vickie's bankruptcy.  (Ex. 431.)[10]  Part 2.B of that memorandum details how Pierce and his lawyers could determine his options for legal recourse.  Included is the following passage:

> 2.      Obtain all the pleadings and briefs for review by Judge Hunter.  I very much appreciate this very valuable step.  It would be most helpful to have the Judge's advice regarding what elements are needed to:
>
>> A.      Successfully move for a new trial and prevailing;
>>
>> B.      Successfully move for an appeal and prevailing.
>
> 3.      After the Judge has had a chance to review the case, Jeff [Townsend] needs to visit with him to discuss the issues and the Judge's advice. . . .
>
> 4.      Seek the advice of other "wise men" who may be able to help us achieve our objectives A & B above.

(Ex. 431, pp. 1-2.)  Pierce confirmed during his testimony that "Judge Hunter" referred to Edwin Hunter's father, Judge Edwin F. Hunter, Jr.  Later in the memorandum, where he writes:

> I think we were badly home-towned, but perhaps it is good because we will be more ready next time for what to expect from the California courts.  We need to modify our behavior and analysis accordingly.  That is the purpose of the experience.  We need to use aggressively every opportunity to home-town them in Louisiana.

(Ex. 431, p. 4.) This memorandum makes clear that, at the very least, Edwin Hunter had offered to Pierce the services of his father, a sitting federal district judge, in analyzing and recommending litigation strategy for a client in an attempt to overturn the ruling of a fellow district court judge.[11]  In addition, the phrase "other wise men" appears to refer to other judicial officers in the state.

This conduct gives rise to even more serious questions about Hunter's character.  If Hunter was merely seeking advice, on behalf of Pierce, about the

---

[10] [During the presentation of the case to the Court, several documents were made available to Vickie's counsel by Pierce, with Pierce reserving the right to object to them based on privilege.  The Court has not relied on any document as evidence that is subject to a legitimate claim of attorney-client privilege. However, Exhibit 431 is potentially privileged communication from Pierce to his attorney Hunter.  The Court, however, finds the exhibit admissible for two reasons.  First, throughout the proceedings, Pierce has contended vehemently that Hunter did not represent him, and Hunter has testified to the same effect. Second, this document is admissible under the crime-fraud exception to the attorney-client privilege. *See, e.g.*, *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996).  Here, the communication shows Pierce arranging to have Townsend seek information from a federal judge about a separate pending civil action.  This constitutes a fraud on the court and potentially obstruction of justice in violation of 18 U.S.C. § 1503.  Pierce's objection of privilege is therefore overruled.]

[11] [The fact that the memorandum was written by Pierce indicates that Pierce was complicit in this conduct.]

prospects for winning a new trial or an appeal, he could have approached dozens of well respected appellate law firms.[12] Approaching a judge, in violation of the principles of ethics, suggests that Hunter was seeking to use Judge Hunter's influence, not just his legal skills, in order to further Pierce's litigation posture. Such an approach is unquestionably unethical, potentially criminal, and certainly shows Hunter's character to be untrustworthy.

The Court concludes that Edwin Hunter's testimony consisted of numerous lies, and that he has no credibility as a witness." *Id.* at 33-36.

\*       \*       \*

As part of its conclusion about Edwin Hunter's testimony, the Court wrote:

In light of Hunter's behavior, the Court encourages the United States Attorney for the Central District of California to undertake a close review of the record in this case to determine whether to seek an indictment for perjury under 18 U.S.C. § 1621.

*Id.* at 36 n.28.

Later in *In re Marshall*, 275 B.R. 5 (C.D. Cal. 2002), this Court noted its deep suspicion of Pierce and Hunter, to the extent that the Court felt they could not be trusted with original documents: "Given the record of document tampering in this case, there is an obvious concern that an original in the hands of Pierce and Hunter would be altered or destroyed." *Id.* at 40, n.34.

This Court also clarified the relationship between Hunter and Pierce and noted egregious actions taken in bad faith. Those findings are as follows:

"Pierce testified that, had J. Howard lived until March 31, 1996, MPI would have had to borrow nearly $10 million to finance the payments due on the private annuity and note. At the time, MPI had obtained a $15 million line of credit from Texas Commerce Bank, secured by MPI's interest in Koch stock. According to Pierce, Texas Commerce Bank had become concerned with the amount of money outstanding to MPI. It had insisted that MPI reduce its debt to $12 million and that it stop taking out loans to finance J. Howard's personal spending. It is therefore unfathomable how Pierce would have been able to convince Texas Commerce Bank to nearly double MPI's line of credit to pay the amounts due under the note and the private annuity. Moreover, even if it had been able to borrow enough to pay the amounts due in 1996, Hunter testified that the private annuity would only be a good business decision for J. Howard if he lived for five years or more. Thus,

---

[12] The Court notes that Pierce has been represented in this matter by the Los Angeles firm Jeffer, Mangels, Butler & Mamaro, one of the most prominent firms in the city.

MPI would have had to borrow nearly $50 million over five years to finance J. Howard's personal spending, at a time when its lender had reduced its line of credit from $15 million to $12 million. The testimony that the May 1995 transactions were legitimate and sound business decisions, undertaken at the behest of J. Howard, is contradictory and therefore not credible." *Id.* at 44, n.39.

"Pierce and Hunter's actions of slowly draining J. Howard of assets in order to prevent a gift to Vickie were egregious in nature. What is worse, however, is that many of the documents at issue in the case were destroyed, backdated, altered, or prepared and presented to J. Howard under false pretenses. This was done in order to prevent Vickie from receiving funds, out of fear that J. Howard might sign a will or other gift instrument at Vickie's behest, and to avoid the legal consequence of important dates in J. Howard's final years including his marriage to Vickie and the appointment of a guardian ad litem to manage his affairs. The backdating and altering of the documents was done with the full knowledge of Pierce. Most of the backdated documents were prepared by Edwin Hunter, whose brilliant machinations on estate planning Pierce relied on to devise the necessary actions." *Id.* at 45.

"These pages [of the Amended and Restated Living Trust Document] have been substituted due to intentional acts by Hunter, with the knowledge of Pierce." *Id.* at 48.

"Evidence of Pierce's tortuous conduct is legion. Acting in concert with Hunter, they backdated documents, altered documents, destroyed documents, suborned falsified notary statements, presented documents to J. Howard under false pretenses, and committed perjury." *Id.* at 53.

"Here, the evidence of willfulness, maliciousness, and fraud is overwhelming. Pierce and Hunter engaged in a pattern of deceiving J. Howard for nearly two years. They presented documents under false pretenses, suborned perjured notary oaths, falsified and backdated documents, and altered documents, all with the intent of denying Vickie the gift that J. Howard intended to make to her. Pierce was the primary beneficiary of these acts. Pierce had private investigators follow J. Howard when he left Texas to visit Vickie. In support of their plans, Hunter considered abusing the high office of a federal judge. Pierce's conduct continued even after J. Howard was dead, as he participated in a plan to solicit a federal judge and appears to have altered the Renunciation document in February 1996." *Id.* at 57.

\*       \*       \*

Further, this Court also upheld many of the findings of fact proposed by the bankruptcy court in its October 6, 2000, Original Decision, *Marshall I,* 253 B.R. 550. The relevant findings from the Original Decision, drawn from pages 556 to 558, are as follows:

**[III. Pierce's Discovery Abuses]**

The court previously found that Pierce engaged in massive discovery abuse in this adversary proceeding in connection with the production of documents properly requested under Rule 7034, which incorporates by reference Rule 34 of the Federal Rules of Civil Procedure.

Pierce's discovery infractions include four kinds of egregious discovery abuse. First, he failed to serve a written response within 30 days after the service of the request, as required by Rule 34(b) and incorporated by reference in Fed.R.Bankr.P. 7034.[13] Second, more than a year after the document production request (and after monetary sanctions had been imposed more than once), Pierce provided a privilege log which listed thousands of documents that were not produced based on claims of attorney-client privilege or work product. This privilege log was grossly insufficient for supporting his claim that the documents were not subject to discovery. Third, Pierce disobeyed altogether the court's order to submit these documents for examination in chambers to determine whether the documents qualified for discovery exemption. Fourth, Pierce destroyed a substantial quantity of documents that were subject to a pending discovery request. These egregious discovery abuses require that the court impose appropriate sanctions.[14]

### [A. Sending Documents to Attorney]

Pierce testified that, upon J. Howard's death, he boxed up all of J. Howard's papers and sent them to Edwin Hunter in Lake Charles, Louisiana. These papers fall into two categories: papers belonging to MPI and personal papers that belonged to J. Howard at the time of his death. For both categories, Pierce's obligation to produce the documents is the same as if they were still in his personal possession. As to the documents belonging to MPI, Pierce was the president and sole director of MPI at all material times during this litigation and had the power and responsibility to produce the documents.

As to the personal papers of J. Howard, Pierce was the administrator of J. Howard's probate estate in Louisiana when this adversary proceeding began,[15] when the document production requests were promulgated, when responses thereto came due, and when the documents should have been produced. The Louisiana probate case was ultimately dismissed for lack of jurisdiction and a new probate case was filed in Texas, where a different administrator was appointed. However, Pierce's default occurred during his watch, and his failure to produce the documents cannot be excused by his subsequent replacement by another administrator. Furthermore, the court is informed that Pierce's successor eventually

---

[13] [Pierce also did not serve such a response at any reasonable time thereafter.]

[14] [These discovery abuses are not the only ones committed by Pierce, but only the most egregious.]

[15] [This adversary proceeding began as a claim that Pierce filed in this bankruptcy case for defamation, and Vickie's counterclaim that is the subject of this decision. Summary judgment was previously awarded to Vickie on the defamation claim, because Pierce offered no evidence to support the claim.]

waived any privilege that he had in the documents. Nonetheless, the documents were never produced in this adversary proceeding.

It is hornbook law that delivering pre-existing documents to a lawyer does not change a party's obligation to produce them in litigation. McCormick states:

> [T]his principle is controlling: If a document would be subject to an order for production if it were in the hands of the client it will be equally subject to such an order if it is in the hands of his attorney.

McCormick on Evidence 330 (John William Strong, ed., 4th ed.1992); *accord, United States v. Robinson,* 121 F.3d 971, 975 (5th Cir.1997) ("it goes without saying that documents do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer"); *Smith v. Texaco, Inc.,* 186 F.R.D. 354, 356–57 (E.D.Tex.1999). McCormick further states that any other rule "would be an intolerable obstruction to justice." McCormick, *supra,* at 329.

Pierce had full responsibility for the production of all documents in either of these two categories that he sent to Hunter. When Vickie made demand for the production of the documents, Pierce's responsibility was to instruct Hunter to produce the documents for inspection or copying, or to raise any claimed defense to their discovery in a timely filed response. Hunter did neither.[16]

**[B.   Claiming a Privilege]**

A party claiming a privilege has the burden of showing that the privilege applies. *United States v. Bauer,* 132 F.3d 504, 507 (9th Cir.1997). Federal common law governs the application of a privilege in an adjudication based on federal law. *See* Fed.R.Evid. 501. Where state law provides the applicable substantive law, privilege issues are governed by that state's law. *Id.* In this case, the causes of action at issue are governed by Texas law. Thus Texas law governs the issues of attorney-client privilege and work product.

The legal standard for the attorney-client privilege is as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by his legal advisor, (8) except the protection be waived.

*See* 8 J. Wigmore, Evidence § 2292 at 554 (J. McNaughton rev.1961); *see also United States v. El Paso Co.,* 682 F.2d 530, 538 (5th Cir.1982); *Smith v. Texaco, Inc.,* 186 F.R.D. 354, 356 (E.D.Tex.1999).

---

[16] [If, after receiving such instructions, Hunter failed or refused to produce the documents, Pierce's remedy is against Hunter for violation of Hunter's duty as Pierce's agent to obey his lawful orders.]

For each document transmitted to a non-attorney, Pierce must show, as to each such recipient, (a) the recipient's name, (b) the position that the recipient held at the time, (c) if the recipient received the document as a corporate official or employee, how the corporation's privilege applied to the recipient. *See Upjohn Co. v. United States,* 449 U.S. 383, 391–96, 101 S.Ct. 677, 683–86, 66 L.Ed.2d 584 (1981).

Pierce has not made an adequate showing on any of these issues, as to any of the documents at issue. While the names of some of the authors and recipients are given, none is identified as an attorney. The positions of the non-attorneys at the relevant times are not given, nor is any explanation given of how they qualify under *Upjohn.*

The court has serious reservations about the legitimacy of the attorney-client privilege and work product claims. Pierce did deliver more than 100 documents for *in camera* inspection that were in the possession of Jeff Townsend. The court found that approximately 13 of the documents were subject to a legitimate claim of attorney-client privilege or work product. For most of the remaining documents, the court found no good faith contention that either exception applied. The non-qualifying documents included such items as transmittal letters, annual statements of KII, a videotape of J. Howard's arrival at Vickie's home to visit her after their marriage, and photographs of Vickie taken on vacation after J. Howard's death. The court infers from this evidence that most of the attorney-client privilege and work product claims for the Hunter documents are equally meritless.[17]

Because Pierce failed to carry the burden of showing the applicability of either the attorney-client privilege or the attorney work product doctrine, all of the documents on the privilege log should have been produced to Vickie in this litigation. They were not. The court concludes and finds that all of the privilege and work product claims relating to the Hunter documents were also specious and made in bad faith.

### [C. Sanctions for Discovery Violations]

---

[17] [If Ninth Circuit law had governed the procedures relating to the testing of the assertion of attorney-client privilege and work product, that law would require the party opposing the privilege claim to show a factual basis sufficient to support a reasonable, good faith belief that in camera inspection may reveal evidence that information in the materials is not privileged. *See In re Grand Jury Investigation,* 974 F.2d 1068, 1074–75 (9th Cir.1992); *see also United States v. Zolin,* 491 U.S. 554, 572, 109 S.Ct. 2619, 2631, 105 L.Ed.2d 469 (1989) (for determination of crime-fraud exception to attorney-client privilege, once threshold showing is made, court has discretion to conduct in camera review based on all the facts and circumstances of the case, including the relative importance to the case of the alleged privileged information, the likelihood that the evidence produced through in camera review (together with the other evidence in the case) will establish that the exception applies). The experience with the Townsend documents fully satisfies these requirements.]

The court issued its findings and sanctions order on the discovery violations on May 20, 1999.[18] The court subsequently vacated that order. Meanwhile, Pierce has done nothing to vitiate his refusal to produce the documents at issue for an *in camera* inspection. The findings of fact and conclusions of law highlighted in bold in this opinion or otherwise specified are imposed as sanctions for Pierce's discovery abuse. The court finds that many documents listed in the privilege log directly relate to the transactions as to which the sanctions are imposed. Furthermore, there is no way to know what was in the documents that Pierce destroyed while they were subject to a discovery request.

In addition, Edwin Hunter testified at the trial over Vickie's objections based on Hunter's failure to produce the Hunter documents or to submit them to the court for *in camera* inspection. The court now sustains those objections, and strikes Hunter's testimony.

\*     \*     \*

The bankruptcy court, in ruling on the issue of punitive damages, found that Pierce's "totally unjustified refusal to provide discovery in this adversary proceeding has prevent this court from determining this adversary proceeding on its merits. Because this is a high profile case that has attracted substantial public attention, Pierce Marshall's conduct substantially promotes a disrespect for the federal courts and the degree of justice that they dispense." Supplemental Mem. of Decision Following Trial, LA 96-01838-SB, Dkt. 720 at 5, Nov. 21, 2000. Although this Court recognizes the difference between punitive damages and sanctions, it wholeheartedly agrees with the bankruptcy court's conclusion that Pierce's actions have promoted a disrespect for the federal courts. As relevant here, Pierce's actions have caused Plaintiff significant expense in litigating matters in which it appears clear that one side has repeatedly decided not to play by the rules.

//

//

    c.  **Plaintiff may pursue civil sanctions, not punitive sanctions, to compensate her for expenses incurred as a result of Pierce and Hunter's misconduct**

---

[18] [The court issued a prior set of findings and sanctions on January 21, 1999, which were vacated by the district court and remanded for more specific findings.]

Courts have drawn a distinction between civil sanctions and punitive sanctions. Here, the Court believes civil sanctions are the appropriate remedy for Plaintiff pursue. As the Ninth Circuit has noted, the inherent power of a federal court to manage its cases and courtrooms provides an ability to punish conduct both within the confines of a court "and beyond, regardless of whether that conduct interfered with trial." *F.J. Hanshaw Enterprises, Inc. v. Emerald River Dev., Inc.,* 244 F.3d 1128, 1136 (9th Cir. 2001) (citing *Young v. United States ex rel. Vuiton et Fils S.A.*, 481 U.S. 787, 798 (1987)).

*Hanshaw* reversed an imposition of punitive sanctions on a party that had tried to bribe a court-appointed receiver. *See id.* at 1131. The Ninth Circuit borrowed from case law regarding contempt as a way to inform the protections due to a party that a court seeks to sanction. *Id.* at 1137 (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)). In *Bagwell*, the Supreme Court held that a $52 million fine imposed on a union for breach of court injunctions was a criminal penalty. *Bagwell*, 512 U.S. at 827-28. The *Bagwell* Court noted that "whether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved," and that a contempt sanction if "remedial, and for the benefit of the complainant" is civil, and it is criminal if "punitive, to vindicate the authority of the court." *Id.* (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911)).

A further way to describe the civil/criminal distinction is that a civil/remedial fine seeks to either coerce a defendant into compliance with a court order, or to compensate the complainant for losses sustained. *Id.* at 829. While the Supreme Court has tended to classify a fine paid to a court as punitive, and fines paid to a party as remedial, the person who gets the fine is "not determinative." *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1111 (9th Cir. 2005) (citing *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632 (1988)). In *Hanshaw*, the district court had imposed punitive sanctions without providing the procedural protections of a criminal trial, such as an independent prosecutor and a requirement for proof beyond a reasonable doubt.  244 F.3d at 1138-39. This was reversible error. *Id.*

Here, as the Court noted, *supra* at 19, the U.S. Attorney had the opportunity to consider whether to pursue a criminal prosecution against Edwin Hunter for perjury. That office declined

to do so back when this case was not nearly as old as it is today. As this Court considers Plaintiff's claims to have been gravely harmed by Pierce and Hunter's actions, it finds that the appropriate remedy is limited to granting Plaintiff's request to pursue sanctions only so long as those sanctions are remedial, aimed to compensate Plaintiff for expenses incurred as a result of misconduct.

### i.  Potential sanctions as to Edwin Hunter

Hunter is entitled to a hearing to contest the issues of bad faith and the amount of any sanctions. *Western Sys., Inc. v. Ulloa,* 958 F.2d 864, 873 (9th Cir. 1992).[19] Hunter should already be well aware of the risk of remedial sanctions against him, given past findings that he acted in bad faith and the fact that this Court went so far as to recommend possible prosecution for perjury. This Order to Show Cause serves to provide "sufficient, advance notice of exactly which conduct was alleged to be sanctionable." *In re Deville*, 361 F. 3d at 549.

The Court addresses two arguments it anticipates from Hunter. First, the fact that Hunter is no longer involved in this case has no effect on his ability to be sanctioned. *In re Itel Sec. Litig.,* 791 F.2d 672, 675 (9th Cir. 1986) (upholding sanctions against counsel whose counsel was no longer in the case, and noting, in considering case law, that "there is absolutely no hint . . . that a lawyer may escape sanctions for misconduct simply by withdrawing from a case before opposing counsel applies for sanctions.").

Second, the fact that Plaintiff did not move for sanctions against Hunter is no bar. Sanctions may be awarded sua sponte under the court's inherent power, regardless of whether the opponent moved for them. *Piper,* 447 U.S. at 765; *In re Itel Sec. Litig.,* 791 F.2d at 675.

---

[19] *See also Piper,* 447 U.S. at 767 ("sanctions . . . should not be assessed lightly or without fair notice and an opportunity for a hearing on the record."); *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. P'ship,* 76 F.3d 1003, 1007-08 (9th Cir. 1996) (hearing necessary to determine bad faith). "Ordinarily a court proposing to impose sanctions notifies the person charged both of the particular alleged misconduct and of the particular disciplinary authority under which the court is planning to proceed." *In re DeVille,* 361 F.3d 539, 548 (9th Cir. 2004). A party to be sanctioned must be provided with "sufficient, advance notice of exactly which conduct was alleged to be sanctionable and, furthermore were aware that they stood accused of having acted in bad faith." *Id.* at 549 (citation omitted). *See also Toombs v. Leone,* 777 F.2d 465, 472 (9th Cir. 1985) ("Due process . . . requires that parties subject to sanctions have 'sufficient opportunity to demonstrate that their conduct was not undertaken recklessly or willfully.' ").

Hunter is now on notice and is hereby ORDERED TO SHOW CAUSE why sanctions should not be issued against him for actions taken during this litigation in bad faith.

### ii.  Potential sanctions as to Pierce Marshall

Pierce's bad faith conduct was too pervasive and too egregious to be ignored, despite the fact that he has since passed away. It would promote disrespect for the authority of the federal courts to turn a blind eye to actions that so willfully and blatantly attempted to make a mockery of this justice system. Further, it would reward a party for win-at-all-costs tactics, to the deprivation of his opponent. Such behavior cannot be condoned.

It is a straightforward proposition that a decedent's estate may be held liable for the decedent's sanctionable conduct, an admittedly rare situation most often found in protracted litigation. *See, e.g. In re Consol. Pretrial Proceedings in Air W. Sec. Litig.,* 73 F.R.D. 12, 13 (N.D. Cal. 1976) (where court granted motion for sanctions against party's estate for that party's failure to appear for his deposition); *Estate of Calloway v. Marvel Entm't Group, a Div. of Cadence Indus. Corp.,* 9 F.3d 237, 239 (2d Cir. 1993) (sanction against party was reinstated against his estate when the sanction was reaffirmed on remand, by which point that party has passed away). As such, Plaintiff may pursue sanctions against Pierce's Estate for Pierce's actions.

### iii.  The Court rejects Plaintiff's effort to pursue sanctions against MPI

This Court will not allow Plaintiff to pursue sanctions against MPI. MPI was not a party to the case in which sanctionable conduct occurred, nor did this Court make any specific findings of misconduct by MPI. Although Pierce was the president and sole director of MPI, this Court is unwilling to establish the expansive rule that a president and sole director of a corporation is always acting on behalf of that corporation. Plaintiff provided no legal authority to demonstrate why an entity not involved in a case in which sanctionable conduct occurred can be sanctioned due to actions of its president and director that were not taken directly on its behalf.

### IV.    Conclusion

For the reasons above, the Court:

- GRANTS the Motion for Judgment on the Pleadings;

- GRANTS the Motion to Stay Entry of Judgment Pending Disposition of the Sanctions Motion;

- DENIES the Motion to Stay Entry of Judgment Pending Disposition of the Texas Appeal;

- GRANTS the Motion for Sanctions against Pierce's Estate and shall allow Plaintiff to pursue those sanctions;

- DENIES the Motion for Sanctions as to MPI;

The Court also sua sponte ORDERS Edwin Hunter to Show Cause why he should not be sanctioned. The appropriate next step is a status conference, which the Court SETS for August 13, 2013, at 8:30 a.m. Plaintiff should be prepared to discuss what remedial sanctions Plaintiff wishes to pursue, identifying the specific misconduct and specific costs that Plaintiff unjustifiably had to incur because of that misconduct. The Court will then set a further schedule as to briefing or hearings.

DATED:  May 29, 2013

_David O. Carter_
_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE